(July 31, 1986)

■ EMPIRE MUTUAL INSURANCE COMPANY, Appellant-Respondent, v APPLIED SYSTEMS DEVELOPMENT CORP., Respondent-Appellant.—Order of the Supreme Court, New York County (Francis N. Pecora, J.), entered on June 12, 1985, which, *inter alia,* denied the parties' respective cross motions for summary judgment, and granted defendant's cross motion for an order compelling further answers to interrogatories only to the extent of compelling answers to some of the interrogatories upon condition that defendant sign a confidentiality stipulation, modified, on the law and the facts and in the exercise of discretion, without costs, to the extent of (1) granting plaintiff's cross motion for summary judgment on the issue of liability; (2) severing defendant's counterclaims; and (3) directing an immediate hearing on the issue of plaintiff's damages

pursuant to CPLR 3212 (c), without prejudice to defendant undertaking further disclosure proceedings, if so advised, with leave of the court.

By a seven-page letter agreement with three schedules attached, dated December 3, 1980, defendant agreed to perform certain policy rating and issuance services for plaintiff's homeowners and fire insurance business. The service involved the use of certain computer equipment, or hardware, owned and maintained by defendant, and computer programs, or software, designed by defendant. Plaintiff's computer programming staff was to feed data regarding each insurance application, existing policy, and risk into terminals in plaintiff's office for transmission to defendant's office. There, the data were to be processed, i.e., a premium established for each insurance application and an actual policy printed out for each application that was accepted.

In addition to the rating of individual applications, defendant's system also had the capacity to compile a policy master file tape from the mass of information relating to individual applications and policies. At issue herein is whether the parties' contract required defendant to deliver a policy master file to plaintiff on a monthly basis.

In the preamble to the contract, defendant agreed to provide "Policy Rating and Issuance Services" to plaintiff, "and normal programming maintenance services required to Rate and Issue" plaintiff's homeowners and fire policies. Paragraph I (entitled "Processing Scope") required defendant to perform "all computer operations necessary to update a Policy Master File, rate the policy, and issue required policies". Paragraph II (entitled "Processing Considerations") sets forth various features of defendant's service, including, under subparagraph J, a "duplicate Policy Master File tape" to be provided "[e]ach month, or at an agreed frequency * * * for use as needed." Paragraph II (J) further provided that "[t]he method of data representation in these tapes is proprietary to [defendant] and cannot be made available to persons other than [plaintiff's] Employees." Under paragraph IV (entitled "Costs"), defendant's compensation for "Policy Processing" (the title of subparagraph A) was to be on the basis of a unit price, i.e., by the number of policies processed, in accordance with a schedule of volume prices attached to the contract. Expressly excluded from this unit price were "On-Line Services" (an aspect of processing which, according to a price schedule annexed to the contract, has to do with policy entry, policy inquiry, policy printing, claims processing, policy quotations rate analysis,

and rate page development), "Implementation" and "Customization". Subparagraph F of paragraph IV (entitled "Programming Services") provided: "Processing costs include normal programming and system maintenance support required for On-Line services and to rate and issue policies. [Defendant] reserves the right to submit a separate cost proposal for services requested by the [plaintiff] that are deemed by [defendant] to be outside the scope of normal maintenance." Under paragraph V (entitled "[Defendant's] Pricing Policy"), defendant agreed not to increase its prices for processing services without prior notice of at least 12 months, and in no event would such notice be given during the first 12 months of the contract, thus assuring plaintiff that the price schedule annexed to the contract would remain in effect for at least 24 months. Paragraph VII (entitled "Use of Information") provided that all information contained in magnetic tapes provided by defendant to plaintiff is proprietary to plaintiff, and that the methods of data representation of this information on magnetic tapes is proprietary to defendant. Paragraph VIII (entitled "Time Period Covered by this Agreement") provided that defendant's performance was to be for a minimum of 24 months, although plaintiff was given the option of terminating the agreement after the first 18 months upon 180 days' notice. Finally, paragraph XII (entitled "Understandings") provided that the agreement contains the "entire understanding" of the parties.

For the first 17 months, defendant delivered a monthly policy master file tape to plaintiff without any additional charge. Then defendant advised plaintiff by letter that it was suspending delivery of the master tape on the ground that proprietary information contained therein had become known to competing software vendors. Nevertheless, defendant offered to make the tapes available to plaintiff for an additional charge.

Plaintiff refused to pay the price defendant demanded, and notified defendant that it was canceling the contract. Plaintiff then retained a data-processing firm to duplicate all individual policies onto computer tapes, and from these tapes to create a policy master file tape, at an alleged cost of $573,150.92. This is the sum plaintiff seeks to recover as damages. Plaintiff then retained another firm to replace defendant's rating and issuance services and to provide updated policy master file tapes on a monthly basis.

The complaint alleges that defendant's refusal to deliver a monthly policy master file tape was a breach of paragraph II

(J) of the contract, and seeks to recover as damages the amount paid to duplicate the file. Insofar as urged on appeal, the amended answer sets up various affirmative defenses and counterclaims, all alleging that plaintiff itself breached the contract by making the policy master file tapes available to third parties. This, argues defendant, entitled it to terminate delivery of the tapes. Yet, even if there was no such disclosure, argues defendant, still it was entitled to suspend delivery of the tapes "at any time" because, under paragraph IV (F), it had the right to set a price for a service not elsewhere specifically priced in the contract. Defendant argues that paragraph IV (F) is applicable because the policy master file tape is outside the scope of normal maintenance, which in the trade is understood to mean only upkeep of terminals, transmission lines, hardware and software. While acknowledging that the master tape is a byproduct of its processing operations, defendant also argues that it is not a programming or processing service within the price structure of the contract since those services relate only to on-line services and the rating and issuance of policies.

As construed by this court, the contract called for plaintiff to furnish "Policy Rating and Issuance Services", and, incidentally, any "normal programming maintenance services" required therefor. In furnishing these services, it was defendant's obligation, under paragraph I, to perform "all computer operations necessary" not only to rate and issue the policies, but also, as it happens, "to update a Policy Master File". In this way, the master file, unlike most of the other "Processing Considerations" or features of defendant's operations mentioned along with the master file in paragraph II, was squarely placed within the "Processing Scope" of the contract.

Paragraph IV (F), heavily relied upon by defendant, provided that "normal programming and system maintenance support required for On-Line services and to rate and issue policies" were to be included in the unit price for processing. Accepting defendant's explanation of technical terms, computer operations, such as defendant performs, require "maintenance", that is, both upkeep of the computer equipment, or hardware, and updating of the computer program, or software. Quite analogous, seemingly, is the periodic supplementation of a lawyer's library service, although here, there were to be no separate, periodic charges for the updating service for at least two years. Defendant did, however, "reserve the right" to "deem" any "requests" for "services" plaintiff might happen to make to be "outside the scope of normal maintenance",

and, therefore, not covered by the agreed-upon unit price but subject, rather, to "a separate cost proposal". This reservation did not, however, give defendant the right, "at any time", to unilaterally fix a price for the master file and impose a separate charge therefor. As the master file fell within the scope of processing, so too did its normal monthly maintenance. In demanding the master file, plaintiff was only asking for a service that was agreed upon from the beginning, in two separate provisions of the contract no less.

In specifying that "[p]rocessing costs *include* normal programming and system maintenance support required for On-Line services and to rate and issue policies" (emphasis added by the court), paragraph IV (F) does not mean "include only". Subject to its contextual usage, the word "include" is generally a term of enlargement and not of limitation, connoting an illustrative application of a general principle (20A Words and Phrases, Include). Thus, paragraph IV (F) does not manifest an intent to exclude from the unit price for processing any particular items, such as the master file, associated with processing elsewhere in the contract. It is clear that the specification of normal programming and system maintenance was intended merely to clarify and emphasize that such services are within the price structure of the contract *(see, People ex rel. Estate of Woolworth v State Tax Commn.,* 200 App Div 287, 289).

Factual circumstances dehors the contract fully support the conclusion that a monthly master file tape was to be provided by defendant without additional charge. Defendant had supplied the master file without separate charge for the first 17 months of this two-year agreement. When it "suspended" delivery, it did so not on the pretext that paragraph IV (F) gave it the right, but that "proprietary information", namely, the method of data representation in the master file, had become known to other software vendors, making it necessary for defendant to impose a separate charge therefor. Even this does not ring true as the more natural reaction to the misappropriation of a trade secret would have been to terminate access to the secret, and not demand, as defendant did, additional payment in exchange for continued access. More likely is plaintiff's explanation that defendant, knowing that plaintiff was planning not to renew the contract, stopped delivering the master file in retaliation; and that its present reliance on paragraph IV (F) is an afterthought.

In addition, defendant offers no evidence of any discussions had with plaintiff during contract negotiations as to the

possibility that an unspecified, additional charge for the master file might be imposed "at any time"; it does not deny plaintiff's assertion that the master file is customarily provided to all of its customers without separate charge; and it does not put in any evidence of the cost to it of supplying the master file. Indeed, since the master file is a "byproduct" of defendant's operations, it appears the item can be produced at negligible cost, making apparent the business sense of an agreement to deliver it without charge.

There is no merit to defendant's affirmative defenses alleging that plaintiff breached the contract in making proprietary information available to unauthorized third persons. The allegation is wholly unsupported by evidentiary facts, and indeed, in its papers, defendant is able to do no more than speculate on the matter. Nowhere does defendant describe the "[i]nformation [that] came to [its] attention * * * that indicated that [plaintiff] might have been violating [its] proprietary rights by divulging [its] tapes". The one item of proof defendant does offer on this subject—and internal memorandum of another insurance company indicating plaintiff's interest in purchasing the software used by that company in converting out of defendant's system—is hearsay, and, in any event, hardly indicates divulgence by plaintiff of the master file tapes or other proprietary information. Nor are any facts offered showing that it was technologically impossible for plaintiff to convert over to the new software it purchased without making improper use of defendant's proprietary information, if this is what defendant suggests by noting plaintiff's "limited" in-house capabilities. Defendant asserts that the facts it needs to verify its suspicions are exclusively in plaintiff's possession; however, that circumstance does not entitle defendant to rest entirely on mere conclusions, expressions of hope or unsubstantiated allegations or assertions (*Zuckerman v City of New York,* 49 NY2d 557, 562).

Also under review is a cross motion by defendant to compel plaintiff to provide further answers to 26 of the 83 questions propounded in defendant's second set of interrogatories. Concerning this, orderly procedure mandates that defendant's second set of interrogatories be discarded, without prejudice to defendant undertaking such further disclosure proceedings as it deems appropriate and as may be allowed by the court. This is so notwithstanding that a motion for a protective order pursuant to CPLR 3133 was not made by plaintiff. These interrogatories were prepared as much with an eye towards obtaining evidence of misappropriation of proprietary informa-

tion as towards disclosure of evidence pertinent to plaintiff's damage claim. Given defendant's inability to show merit to its claim of misappropriation, efficient case management would be furthered by taking a fresh look at the matter from the viewpoint of damages only, the sole remaining issue in the case.

With respect to damages, the dispute appears to be over whether it was necessary to duplicate, or re-create, all or part of the master file, and, if so, to what extent the duplication was more expansive than the file it replaced. Some of the interrogatories plainly bear on liability only and are irrelevant to these damage questions. The relevance of some other interrogatories to these questions is not readily apparent, and some of those that do appear relevant are so broadly worded as to admit of only narrative responses that could just as well be given at a deposition. This is not to say that all of defendant's questions are improper; nor is it to say that all of plaintiff's responses are adequate. It is to say that dismissal of the affirmative defenses leaves the second set of interrogatories not sufficiently related to the pleadings as to make the effort to prune it worthwhile. No doubt, some few of the interrogatories do properly seek information pertinent to plaintiff's damage claim, but even as to these it appears that answers can be provided, more effectively at that, through document production or oral examination. It might even be that incisive oral examination of plaintiff, particularly in connection with the documents it has already produced, might obviate the need for further written questions altogether. In short, the dispute over damages needs further definition and limitation, an object these interrogatories have little potential for advancing.

The damage issues are complex, involving technical aspects of computer operations as to which, it is clear, the parties have not even been able to reach a common vocabulary. Given this complexity, and, to say the least, the less than full cooperation in the disclosure proceedings already had, it is better that, to the extent more disclosure is needed, it be conducted only with leave of the court. Concur—Murphy, P. J., Kupferman, Ross, Rosenberger and Wallach, JJ.