(305 P.3d 669)

No. 108,007

PHIL G. RUFFIN, *Appellee*, v. RADIOSHACK CORPORATION,
*Appellant*.

—

Opinion filed
June 28, 2013.

*John T. Walsh*, of Clayton, Missouri, and *Matthew L. Heffner*, of Lathrop & Gage LLP, of Overland Park, for appellant.

*James R. Gilhousen*, of Crockett & Gilhousen, of Wichita, for appellee.

BEFORE ATCHESON, P.J., GREEN and MCANANY, JJ.

GREEN, J.: This litigation arises out of a lease agreement and involves the interpretation of the lease agreement. RadioShack Corporation (RadioShack) leased space in a shopping center from Phil G. Ruffin in Wichita, Kansas. A significant provision of the lease provided for abatement of rents in the event that the occupancy of Ruffin's shopping center dropped below a certain amount. Over the course of the next several decades, the parties entered into a series of options to extend the lease and agreed to multiple

extension agreements, which allowed RadioShack to remain in possession of the premises. Ruffin and RadioShack's landlord and tenant relationship proceeded along amicably until November 15, 2011. On that date, Ruffin sent RadioShack a letter seeking to buy out RadioShack's remaining interest in the lease so that it could demolish the shopping center. When RadioShack requested a higher buyout to relinquish its leasehold, the parties were unable to come to an agreement. Soon after, Ruffin sent RadioShack two separate notices to quit the lease premises, asserting that RadioShack had failed to pay the full rent due under the lease. The following month, Ruffin filed a forcible detainer action in Sedgwick County, Kansas, maintaining that RadioShack had failed to "pay rent, taxes, and related damages."

Ruffin's forcible detainer action proceeded to a bench trial, and the trial court entered judgment in favor of Ruffin. On appeal, RadioShack raises the following issues: (1) whether the excessive vacancies clause was still in effect when RadioShack sought to invoke it in 2007; (2) if not, whether the trial court erred when it concluded that Ruffin did not waive his right to receive a rent amount based on the fixed minimum rent provision of the lease extension after he accepted reduced rent payments in accordance with the excessive vacancies clause; (3) whether the trial court erred when it concluded that Ruffin's phone call to RadioShack constituted a repudiation of RadioShack's invocation of the excessive vacancies clause; and (4) whether the trial court erred in finding that Ruffin was entitled to possession of the property.

We determine that the trial court erred when it determined that the excessive vacancies clause was no longer in effect in 2007. Because we are reversing the judgment in favor of Ruffin based on contract interpretation, it is not necessary for us to address the trial court's repudiation ruling. As a result, we determine that the trial court improperly awarded possession of the property to Ruffin. Accordingly, we reverse and remand with directions.

Ruffin owns a substantial amount of real estate throughout the country, including properties in and near Wichita, Kansas. In 1973, Ruffin leased one of his Wichita properties—a space in a shopping center—to RadioShack. The original term of the lease was for 10

years. But the lease agreement included an extension option that allowed RadioShack to extend the lease from its 1983 expiration date until 1988 at an increased rent amount. RadioShack exercised the option, which extended the lease agreement until 1988. Before the expiration of the 1988 lease extension, Ruffin and RadioShack negotiated an extension agreement that extended the lease to June 18, 1995.

In 1994, Ruffin and RadioShack entered into another lease extension (1994 lease extension). This time, the parties agreed to extend the lease through June 18, 2000, with an option for RadioShack to extend the agreement for an additional 60 months. The 1994 extension also contained an incorporation by reference clause, which stated:

"This Lease Extension Agreement shall be upon the same terms, covenants and conditions provided in the Lease, except as the same are hereby modified and supplemented. Wherever there is any conflict between this Lease Extension Agreement (hereinafter referred to as this 'Agreement') and the Lease, the provisions of this Agreement are paramount and the Lease shall be construed accordingly."

Under the 1994 lease extension, the word "Lease" was described as the original lease agreement from 1973 "together with all modifications and extensions thereof."

Finally, the 1994 lease extension contained three separate rental payment terms that were designed to define the rental payments that were owed to Ruffin based on various economic conditions. The three rental payment terms were as follows:

"2. FIXED MINIMUM RENT: Tenant shall pay to Landlord as 'Fixed Minimum Rent' the sum of Two Thousand Seventy-eight and 13/100 Dollars ($2,078.13) per month during months one (1) through sixty (60) of the Extension Term.

. . . .

"4. PERCENTAGE RENT: In addition to Fixed Minimum Rent, Tenant shall pay to Landlord the amount, if any, by which, in any Fiscal Year of Tenant, two and one half percent (2.5%) of Gross Sales exceeds the Fixed Minimum Rent for the same period. Percentage Rent shall be paid annually, within sixty (60) days after the end of each Fiscal Year. Except as otherwise modified and supplemented herein, the methods for the determination, reporting and payment of Percentage Rent shall remain as set forth in the Lease. Notwithstanding anything in the Lease or this Agreement to the contrary, Landlord shall have the right . . . to inspect

Tenant's records with respect to Gross Sales made from the Demised Premises, within two (2) years after the close of any Fiscal Year. For purposes of Percentage Rent, Tenant's Fiscal Year is currently January 1st through December 31st.

. . . .

"8. EXCESSIVE VACANCIES: If, at any time during the Extension Term, the Gross Leasable Area of the Shopping Center is less than sixty percent (60%) actively occupied by other retail tenants or a major tenant [any tenant that occupies more than fifteen percent (15%) of the Gross Leasable Area of the Shopping Center] discontinues its operations and a similar tenant does not replace it within a period of six months, then Tenant shall have the option of (a) terminating this Lease by giving Landlord sixty (60) days prior notice thereof and all rights and obligations of both parties shall cease upon the expiration of the aforesaid sixty (60) day period, or (b) paying Landlord three percent (3%) of Tenant's monthly Gross Sales, in arrears, within twenty (20) days after the end of each calendar month, in lieu of Tenant's obligation to pay Fixed Minimum Rent and Percentage Rent as set forth in the Lease. Tenant shall be entitled to pay such percentage of Gross Sales until such time as at least sixty percent (60%) of the Gross Leasable Area of the Shopping Center is actively occupied by other retail tenants, and all major tenants, as defined above, are conducting normal retail operations within the Shopping Center. Notwithstanding Tenant's election to pay a percentage of sales as described, Tenant shall retain the right to terminate the Lease pursuant to the provisions of this paragraph."

In 2000, RadioShack exercised its option to extend the lease to June 18, 2005. In 2005, the parties extended the lease again, this time from 2005 to 2008 (2005 lease extension). The 2005 lease extension included two 5-year renewal options. The 2005 extension also modified the rental terms that were included in the 1994 lease extension. Under the 2005 lease extension, RadioShack agreed to pay Ruffin a fixed minimum rent (FMR) of $2,296.88 per month. Moreover, the 2005 lease extension expressly eliminated the percentage rent clause from the parties' lease agreement. Paragraph 5 of the 2005 lease extension stated the following:

"5. PERCENTAGE RENT: Notwithstanding anything contained in the Lease to the contrary, Tenant shall have no obligation to pay Landlord Percentage Rent. The section entitled 'Percentage Rental' on Exhibit 'A' of the Lease dated the 1st of June, 1973, and Section 4 of the Lease Extension Agreement dated October 27, 1994, and any and all other references to Percentage Rent or Percentage Rental are hereby deemed deleted and of no further force or effect. Gross Sales shall be defined as all merchandise sales credited to the Demised Premises."

RadioShack continued to pay the FMR until 2007. In February 2007, RadioShack sent Ruffin a letter stating its intent to invoke the excessive vacancies clause contained in the 1994 lease extension. In response to RadioShack's letter, Ruffin called RadioShack and demanded that the full FMR be paid. RadioShack refused and continued to pay the reduced amount under the excessive vacancies clause until October 2011.

On November 15, 2011, Ruffin sent a letter to RadioShack informing it of his desire to demolish the shopping center. Ruffin's letter contained the following statements:

"As per our conversation [and] your conversation with my real estate manager, Jon Cyphert, RadioShack is occupying our center under a reduced rent due to vacancy. Due to the low vacancy, we would like to demo the shopping center. Ruffin Properties offers Radioshack [sic] a termination fee of $20,000.00. This should cover any costs of relocation. If acceptable please show your acceptance of the offer by signing below. I can be contacted at the number below."

After RadioShack replied to the November 15, 2011, letter with a request for a higher buyout to relinquish its leasehold, Ruffin sent RadioShack two separate notices to quit the lease premise. Later, Ruffin filed a forcible detainer action against RadioShack in Sedgwick County District Court.

Ruffin's case proceeded to a bench trial, and the trial court entered judgment in favor of Ruffin. In reaching its decision, the trial court made the following three conclusions of law:

"1. The Fixed Minimum Rent clause of [the 2005 lease extension], Paragraph 3 directly conflicts with the Excessive Vacancies Clause of the lease.

"2. [Ruffin's] call to [RadioShack] in March 2007 was a repudiation of [RadioShack's] assertion that the excessive vacancies clause was then in effect.

"3. Pursuant to the terms of the Lease, [Ruffin's] receipt of rent under the Excessive Vacancies Clause was not a waiver or estoppel of [Ruffin's] right to the Fixed Minimum Rent."

*Was the excessive vacancies clause under the parties' 1994 lease extension still in effect when RadioShack invoked it in 2007?*

RadioShack first argues that the trial court erred when it determined that the excessive vacancies clause under the 1994 lease extension was no longer in effect when it sought to invoke it in 2007. Specifically, RadioShack argues that the trial court erred be-

cause "the 2005 Extension does not explicitly remove the Excessive Vacancies Clause, as it removes the Percentage Rent Clause. Therefore, the Excessive Vacancies Clause can only be 'knocked out' if a term of the 2005 Extension is in conflict with the Excessive Vacancies Clause." RadioShack then argues that there are not any clauses in the 2005 lease extension that are in conflict with the excessive vacancies clause. Conversely, Ruffin argues that "the excessive vacancies clause was no longer in effect when RadioShack sought to invoke it." Ruffin maintains that the excessive vacancies clause was not in effect in 2007 because the "Excessive Vacancies clause has a definite beginning date and definite ending date."

RadioShack's first argument on appeal requires this court to interpret the parties' lease agreement coupled with several lease extensions and option renewal agreements. The legal effect of a written instrument is a question of law. It may be construed and its legal result determined by an appellate court regardless of the construction made by the trial court. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction. [Citation omitted.]" *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009).

In this case, both parties agree with the trial court's finding that the lease, together with its various renewals and extensions, was not ambiguous. "When a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992).

The first basic question raised here revolves specifically around the meaning of the lease agreement between RadioShack and Ruffin. Do the parties' lease agreement, renewals, extensions, and option agreements indicate that the excessive vacancies clause in the 1994 lease extension was still in effect in 2007 when RadioShack sought to invoke it?

RadioShack contends that "an examination of the agreements and Extensions, shows that this clause was clearly and unambiguously carried forward into the 2005 Extension." Ruffin, however, contends that the language "[i]f, at any time during the Extension Term" under the provision governing the "Excessive Vacancies" clause is dispositive. For example, Ruffin contends that because the excessive vacancies clause expressly limits its application to the extension term, this clause was in effect only during that time period. Here, the 1994 lease extension defined the extension term as follows: "1. TERM: The term of the lease is hereby extended for a period of sixty (60) months ('Extension Term'), beginning on the 19th day of June, 1995 and ending on the 18th day of June, 2000." As a result, Ruffin contends that the plain language of the 1994 lease extension, which limited the excessive vacancies clause to the term of the extension, leads one to conclude that the parties intended for the excessive vacancies clause to be effective only until June 18, 2000. We note, however, that RadioShack exercised a renewal option on January 17, 2000, which extended the 1994 lease extension until June 18, 2005. That renewal option states that "[t]he option term shall be under the same terms and conditions as set forth in the Lease."

This is highly suggestive of the intention of the parties that the excessive vacancies clause was to be in effect when RadioShack sought to invoke it. Moreover, RadioShack points to the removal of the percentage rent clause from the 2005 extension as additional support for its position. For example, RadioShack maintains that "the fact that parties specifically drafted a Paragraph of the 2005 Extension to remove Percentage Rent bolsters RadioShack's interpretation that the Excessive Vacancies Clause carried forward, because the parties could have otherwise drafted a similar Paragraph for Excessive Vacancies Rent."

The paragraph in the 2005 lease extension relied on by RadioShack reads as follows:

"5. PERCENTAGE RENT: Notwithstanding anything contained in the Lease to the contrary, Tenant shall have no obligation to pay Landlord Percentage Rent. The section entitled 'Percentage Rental' on Exhibit 'A' of the Lease dated the 1st day of June, 1973, and Section 4 of the Lease Extension Agreement dated October

27, 1994, and any and all other references to Percentage Rent or Percentage Rental are hereby deemed deleted and of no further force or effect. Gross Sales shall be defined as all merchandise sales credited to the Demised Premises."

Because the 2005 lease extension did not expressly eliminate the excessive vacancies clause, RadioShack contends that it was incorporated into the 2005 lease extension and therefore was in effect when it sought to invoke the excessive vacancies clause in 2007.

But RadioShack seems to ignore Ruffin's earlier argument that the excessive vacancies clause included its own built-in termination date. Nevertheless, several other provisions in the 1994 lease extension used language tied to the extension term or its expiration: Section 5 on alterations grants the tenant the right "at all times during the Extension Term to make alterations . . . to the interior of the Demised Premises . . . ." In the same section, the tenant's personal property and furnishings are "deemed property of the tenant, and upon expiration of the Extension Term, Tenants shall have the right to remove such items . . . ." In the same section, the tenant is required to return the property "in good repair and condition" at the "expiration of the Extension Term." Similar language is used in Section 7 concerning signage. So, these provisions are the kind that the parties would have continued upon the exercise of a renewal option absent a specific rejection of them (as was done with the percentage rent clause provision).

Moreover, the 2005 lease extension sheds light in support of RadioShack's interpretation of the lease. RadioShack maintains that the excessive vacancies clause was incorporated into the 2005 lease extension because it became "subject to the new definition of 'Extension Term' contained in the 2005 Extension."

The 2005 lease extension described the term of the agreement as follows:

"2. TERM: The term of the lease is hereby extended for a period of 36 months ('Extension Term'), beginning on the 19th day of June, 2005 and ending on the 30th day of June 2008, notwithstanding the designation of the Effective Date above. Any reference in the Lease to Lease Term or Extension Term shall *include* this Agreement and any renewals or extensions thereof." (Emphasis added.)

Under RadioShack's interpretation, "the new definition of 'Extension Term' in the 2005 Extension breathes new life into the Ex-

cessive Vacancies Clause." We note that the excessive vacancies clause does not state that it must be exercised before June 18, 2000, to be effective. To the contrary, the excessive vacancies clause contained in the 1994 lease extension merely states that it is limited to "any time during the Extension Term."

The significant provision of the 2005 lease extension reads as follows: "Any reference in the Lease to Lease Term·or Extension Term shall include this Agreement and any renewals or extension thereof." As we note, the word "include" is a word of enlargement and not limitation. *American Fed. of Television & Radio Artists v. N.L.R.B.*, 462 F.2d 887, 890 (D.C. Cir. 1972). "[I]nclude[] is used when it is desired to eliminate any doubt as to the inclusion in a larger class of the particular class specifically mentioned." *United States v. Gertz*, 249 F.2d 662, 666 (9th Cir. 1957).

Here, in reference to paragraph 2 of the 2005 lease extension, the larger class is "[a]ny reference in the Lease to Lease Term or Extension Term." Moreover, the phrase "this Agreement [2005 lease extension] and *any renewals or extensions thereof*" is a class specifically mentioned and encompassed in the larger class of "[a]ny reference in the Lease to Lease Term or Extension Term." (Emphasis added.) Thus, the 1994 lease extension term is a specifically mentioned class ("any renewals or extensions thereof") of the larger class of "[a]ny reference in the Lease to Lease Term or Extension Term." Moreover, the excessive vacancies clause is included among those things that have "[a]ny reference in the Lease to Lease Term or Extension Term" because it is contained in the 1994 lease extension.

Giving paragraph 2 of the 2005 lease extension a natural and literal interpretation, we determine that the parties intended that the excessive vacancies clause be incorporated into the 2005 lease extension. The excessive vacancies clause simply states that it is limited to "any time during the Extension Term," which was renewed (on January 17, 2000) before the 1994 lease extension term ended (on June 18, 2000). As stated earlier, this renewal option stated that "[t]he option term shall be under the same terms and conditions as set forth in the Lease." Moreover, the 1994 lease extension term is a specifically mentioned class ("any renewals or

extensions thereof") and is encompassed in the larger class of "[a]ny reference in the Lease to Lease Term or Extension Term." Thus, we determine that the excessive vacancies clause contained in the 1994 lease extension term was in effect when RadioShack sought to invoke it in 2007.

*Did the trial court err in finding that Ruffin was entitled to possession of the property?*

RadioShack argues that "the trial court erred in finding that Ruffin was entitled to possession of the property." Based on our previous decisions, Ruffin was not entitled to possession of the property. On March 12, 2008, RadioShack provided written notice to Ruffin that it was exercising its right under the 2005 lease extension to extend the lease term for a period of 60 months. Under this option, the lease would expire on June 30, 2013. We note that the 2005 lease extension includes a second extension option that would allow RadioShack to extend the lease for an additional 60 months. Thus, RadioShack is entitled to possession of the premises at least until June 30, 2013, and until June 30, 2018, if it decides to exercise its renewal option under the 2005 lease extension.

Because we have reversed the judgment on the basis of contract interpretation, we therefore have no need to address the question whether the trial court erred in rejecting RadioShack's waiver contention.

Reversed and remanded with directions that all monies paid into the court as fixed minimum rent or as supersedeas bond or both should be recalculated. The excessive vacancies rent amount should be deducted from these monies, and the balance, if any, should be returned to RadioShack for the period in question.