Rachelle L. Timberlake, appellee, v. Douglas County,
Nebraska, a political subdivision of the
State of Nebraska, appellant.

___ N.W.2d ___

Filed July 17, 2015.    No. S-14-770.

1. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
2. **Statutes.** The meaning and interpretation of a statute presents a question of law.
3. **Contracts.** The interpretation of a contract and whether the contract is ambiguous are questions of law.
4. **Contracts: Declaratory Judgments.** When a declaratory judgment dispute sounds in contract, the action is treated as one at law.
5. **Trial: Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb on appeal unless clearly wrong.
6. **Contracts: Intent.** In ascertaining the parties' intent in a written integrated contract, a court tries to give meaning to all its parts and avoid an interpretation that renders a material provision meaningless.
7. ____: ____. If a particular contract interpretation renders a material provision meaningless, that construction is inconsistent with the parties' intent.
8. ____: ____. A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.
9. ____: ____. Interpretative aids cannot override the parties' clear intent when a contract is considered as a whole.
10. **Intent: Words and Phrases.** The word "include" preceding a list does not indicate an exclusive list absent other language showing a contrary intent.
11. **Contracts: Words and Phrases.** A court gives written words grouped together in a list a related meaning.

12. **Employer and Employee: Employment Contracts: Wages: Appeal and Error.** Under Neb. Rev. Stat. § 48-1229 (Reissue 2010), an appellate court will consider a payment a wage subject to the Nebraska Wage Payment and Collection Act if (1) it is compensation for labor or services, (2) it was previously agreed to, and (3) all the conditions stipulated have been met.

13. **Employer and Employee: Wages.** An employee can earn fringe benefits like sick leave and vacation leave just by rendering services.

14. ____: ____. The list of fringe benefits under Neb. Rev. Stat. § 48-1229(3) (Reissue 2010) is not exclusive.

Appeal from the District Court for Douglas County: W. Mark Ashford, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, Bernard J. Monbouquette, and Jimmie L. Pinkham for appellant.

John E. Corrigan, of Dowd, Howard & Corrigan, L.L.C., for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

The appellee, Rachelle L. Timberlake, is an employee of the Douglas County Department of Corrections. She sustained a concussion while aiding her supervisor, who was having a seizure. She brought this declaratory judgment action to have the court determine her right to "injured on duty" (IOD) benefits under her collective bargaining agreement (CBA). She also requested attorney fees under the Nebraska Wage Payment and Collection Act (Wage Act).[1]

The CBA provides IOD benefits to department employees who are injured while performing a high-risk duty. The CBA provides that high-risk duty "includes (1) responding to a Code, and (2) interaction with an inmate while that inmate is engaged in an act of violence with the officer, another

---

[1] See Neb. Rev. Stat. §§ 48-1228 to 48-1232 (Reissue 2010).

inmate or himself/herself." The dispute centers on whether this sentence provides a nonexclusive list of high-risk duties or conjunctive elements that an employee must satisfy to qualify for benefits. The court concluded that the contract was unambiguous and awarded Timberlake IOD benefits. It also awarded her attorney fees under the Wage Act. Although our reasoning differs somewhat from the court's reasoning, we conclude that it correctly ruled Timberlake was injured while performing a high-risk duty. We affirm.

## II. BACKGROUND

Timberlake is a Corrections Officer I for the department. The terms and conditions of her employment are subject to a CBA between Douglas County and the Fraternal Order of Police, Lodge No. 8. Timberlake worked as an escort at the county jail, relieving officers who are assigned to specific housing units and escorting inmates who are moved through the facility. Her specific position was entitled "2 Delta Escort R1": "2 Delta" referred to her floor assignment. Apart from her other duties, "R1" meant she was a first responder for any emergencies in the facility.

On July 22, 2011, she saw her supervisor go limp and start to slide out of his chair during a seizure. While trying to protect him from hitting his head, she lost her balance and hit her own head against a concrete wall, sustaining a concussion. She called a "code green," which is a request for medical personnel to assist in an area. She said she called a code green because her supervisor was in severe distress and she wanted medical personnel there to assist them.

Soon after the accident, Timberlake was taken to the hospital and missed several days of work. When she returned to work, she requested IOD benefits. She received workers' compensation temporary disability benefits. But IOD benefits ensure that a qualified employee receives his or her full salary starting on the day of the injury, which is greater compensation than workers' compensation benefits provide. The department's director, Mark Foxall, denied Timberlake IOD

benefits, and she sought review by the IOD committee, established under the CBA. The committee recommended that she be granted IOD benefits because her actions were in response to an emergency. Foxall again denied benefits. He stated in a letter to Timberlake that "while a code is involved, it neither involves an inmate nor were there any acts of violence."

After exhausting her administrative remedies, she filed this declaratory judgment action and sought attorney fees under the Wage Act. She alleged that IOD benefits are wages under the Wage Act and that the county violated the act by denying her these benefits.

Timberlake testified that there are five color codes an officer might send to others in the facility. She said a code blue means an officer needs assistance, while a code green means the officer needs medical personnel. A code red alerts officers to a fire, and a code orange alerts officers to an escape. Finally, an officer sends a code yellow to signal a false alarm.

Foxall testified that a code blue was a request for assistance in response to some type of violence, such as an altercation between inmates or between inmates and staff. He said an officer might also call a code blue for assistance if an inmate was menacing or threatening in any manner. Foxall admitted that Timberlake had a duty to respond to any code called by an officer in her area and a duty to respond to any emergency she witnessed that would warrant an officer calling a code. He admitted that the physical incapacity of a corrections officer could pose a security threat and should be reported. He could not recall whether he had authorized IOD benefits for an employee injured while responding to a code other than a code blue. He said he had typically authorized benefits for employees responding to a code blue involving an inmate, because the CBA authorized that. He admitted that the CBA's list of high-risk duties was nonexclusive.

At the close of the evidence, the county argued that the CBA unambiguously excluded IOD benefits for injuries sustained in the circumstances presented by Timberlake's claim. Nonetheless, it requested that the court allow it to come back

and present extrinsic evidence about the CBA's meaning if the court concluded that the contract was ambiguous. Its attorney stated that the county could present the testimony of two negotiators but did not state what their testimony would show. The court, however, stated from the bench that the CBA provided a nonexclusive list of high-risk duties and that the facts showed the CBA entitled Timberlake to IOD benefits.

In its written order, the court stated that after hearing Timberlake's and Foxall's testimonies, it concluded that the meaning of article 25 of the CBA was unambiguous. It stated that article 25, which governs IOD benefits, did not specify the type of code that an employee must be responding to in order to receive IOD benefits for an injury. It concluded that Timberlake was injured while performing a high-risk duty and responding to a code green.

The court found that Timberlake had lost pay for 73.75 hours that the county should have paid to her as IOD benefits. It ordered the county to pay her for these hours, minus the workers' compensation disability benefits that she had received, for a total of $1,075.20 in benefits. The court further determined that Timberlake was entitled to attorney fees under § 48-1231 of the Wage Act, thereby implicitly determining that IOD benefits were part of Timberlake's negotiated wages under the CBA.

### III. ASSIGNMENTS OF ERROR

The county assigns that the court erred as follows:

(1) finding that Timberlake sustained an injury while performing a high-risk duty as set out in article 25 of the CBA;

(2) concluding that article 25 clearly and unambiguously defines a high-risk duty;

(3) excluding extrinsic evidence of the parties' intent in drafting article 25, which was described to the court in an offer of proof; and

(4) concluding that IOD benefits are wages under the Wage Act and awarding attorney fees to Timberlake.

## IV. STANDARD OF REVIEW

[1-3] We independently review questions of law decided by a lower court.[2] The meaning and interpretation of a statute presents a question of law.[3] The interpretation of a contract and whether the contract is ambiguous are questions of law.[4]

[4,5] When a declaratory judgment dispute sounds in contract, the action is treated as one at law.[5] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, which an appellate court will not disturb on appeal unless clearly wrong.[6]

## V. ANALYSIS

### 1. Timberlake Was Performing a High-Risk Duty When She Was Injured

As noted, the crux of this appeal is the meaning of a high-risk duty under article 25 of the CBA. We have considered the meaning of a high-risk duty in only one other case.

In *Mitchell v. County of Douglas*,[7] we held that a deputy sheriff was not performing a high-risk duty when he sustained a heart attack while training on an obstacle course that included a firing range. The county resolution that created the injured-on-duty policy did not define a high-risk duty or specify any conduct that constituted such a duty. We concluded that the phrase "high-risk duty" meant something more than routine employment duties. We cited common dictionary understandings of these words to conclude that an officer must be exposed to a "greater hazard or danger than one would normally encounter in the course of his

---

[2] *Nebuda v. Dodge Cty. Sch. Dist. 0062*, 290 Neb. 740, 861 N.W.2d 742 (2015).

[3] *Id.*

[4] See *David Fiala, Ltd. v. Harrison*, 290 Neb. 418, 860 N.W.2d 391 (2015).

[5] See *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003).

[6] *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015).

[7] *Mitchell v. County of Douglas*, 213 Neb. 355, 329 N.W.2d 112 (1983).

employment."[8] We gave examples of conduct that would satisfy that definition: an officer pursuing a fleeing felon or attempting to charge a building where a felon had secured himself. In contrast, we concluded that the officer's risks of injury on the obstacle course flowed only from his own carelessness or gradual physical infirmity.

Although the county relied on *Mitchell* at oral argument, it does not resolve this dispute. First, we specifically stated in *Mitchell* that our examples of high-risk duties were not intended to define the term in its entirety. Obviously, our examples would not be applicable to an employee working in a corrections facility. More important, unlike the resolution considered in *Mitchell*, here we are analyzing a negotiated CBA with language showing the parties' intent of the type of duty the officer must be performing to qualify for IOD benefits. So we turn to that language.

### (a) Article 25 Does Not Set Out Conjunctive Elements

Section 1 of article 25 makes sustaining an injury while performing a high-risk duty a condition for receiving the benefits and specifies conduct that satisfies that requirement:

> Injured on duty will mean that a Corrections Officer, while in the employ of the Douglas County Corrections Department, is injured while performing high risk duty, including responding to a Code, and that said injury is a direct result of that high risk duty. *"High risk duty" includes: (1) responding to a Code and (2) interaction with an inmate while that inmate is engaged in an act of violence with the officer, another inmate or himself/herself.* A Correction[s] Officer so injured will not be required to use his/her sick leave while recovering from said injury for the first . . . (180) working days of the recovery period or until he/she has reached maximum medical improvement, whichever comes first.

---

[8] *Id.* at 359, 329 N.W.2d at 114.

The determination of whether an employee is entitled to [IOD] benefits shall be made by the Director or his/her designee.

(Emphasis supplied.)

The county argues that items (1) and (2) in the italicized sentence are essential and conjunctive elements, both of which must be satisfied before an employee is eligible for IOD benefits. We disagree.

[6,7] First, in ascertaining the parties' intent in a written integrated contract, a court tries to give meaning to all its parts and avoid an interpretation that renders a material provision meaningless.[9] If a particular contract interpretation renders a material provision meaningless, that construction is inconsistent with the parties' intent.[10] The county obviously considers item (1) to be a material provision because it argues that it is an essential element. But construing the contract to mean that subsection (2) must always be satisfied renders subsection (1) meaningless. That is, if the drafters had intended that an officer must always be interacting with a violent inmate when injured to qualify for IOD benefits, they had no need to include "responding to a Code" as an additional element.

Second, article 25 puts more emphasis on responding to a code than interacting with a violent inmate. Significantly, the first sentence of section 1 makes responding to a code a high-risk duty without mentioning interaction with a violent inmate. So the second sentence operates to expand the type of conduct that is considered a high-risk duty. It clarifies that such duties include responding to a code and interacting with a violent inmate. But the first sentence's separate statement that responding to a code is a high-risk duty refutes the county's argument that an officer must have been both responding

---

[9] See, *Kercher v. Board of Regents*, 290 Neb. 428, 860 N.W.2d 398 (2015); *Gies v. City of Gering*, 13 Neb. App. 424, 695 N.W.2d 180 (2005).

[10] See, *Gies, supra* note 9; Restatement (Second) of Contracts § 203, comment *b.* (1981).

to a code and interacting with a violent inmate to qualify for IOD benefits.

Moreover, even if the county's alternative argument were correct—that article 25 is at least ambiguous—the court specifically stated that the meaning of article 25 was unambiguous in the light of Timberlake's and Foxall's testimonies. The evidence showed that only a code blue is sent to request assistance with a violent or menacing inmate and that other codes are unrelated to that situation. But to conclude that both items (1) and (2) are essential elements would disqualify an officer who was suddenly attacked and injured by a violent inmate and did not have time to call a code blue. Subduing a violent inmate would obviously pose a high risk of injury to an officer. Yet, the officer would only be *confronted with* a code blue emergency—not *responding to* a code blue. We note that the county specifically argues that because Timberlake called a code green *after* she was injured, she was not responding to a code green.[11]

[8] Similarly, an officer injured while responding to a code red for a fire would not be entitled to benefits unless the officer was injured because he or she was interacting with a violent inmate. So the extrinsic evidence shows that the county's interpretation of the contract would result in officers being denied IOD benefits even if they were injured while performing duties that carried a high risk of injury. And a court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.[12]

We also reject the county's position at oral argument that interpreting article 25 to authorize benefits when an officer is only responding to a code would necessarily include responding to a code yellow for false alarms. It argued that this would

---

[11] See brief for appellant at 8-9.

[12] See *Davidson v. First American Ins. Co.*, 129 Neb. 184, 261 N.W. 144 (1935). Accord, Restatement, *supra* note 10, § 203 and comment *c.*; 17A Am. Jur. 2d *Contracts* § 338 (2004).

be an absurd result that the parties could not have intended. But this argument fails to create a latent ambiguity in the contract. A code yellow does not require an officer to respond to an emergency—it requires the officer to stop responding. Finally, Foxall stated at trial that the list of high-risk duties was not exclusive. So even if resort to extrinsic evidence had been necessary, the court was not clearly wrong in rejecting the county's argument that an officer must be interacting with a violent inmate to qualify for IOD benefits.

In sum, the court did not have to resort to extrinsic evidence to determine that the county's "conjunctive elements" interpretation of the CBA was unreasonable. Nonetheless, we agree with its conclusion that article 25 unambiguously authorizes IOD benefits for an officer who is injured while responding to an emergency code. The county's interpretation is contrary to the parties' clear intent in the CBA to provide benefits to employees who are injured while performing a high-risk duty, *including* responding to a code.

But we disagree with the court that Timberlake was responding to a code when she was injured. The county correctly argues that she called a code green after she was injured. The court also concluded, however, that Timberlake was performing a high-risk duty. Whether that conclusion is correct hinges on whether article 25 sets out an exclusive or nonexclusive list of conduct that qualifies as a high-risk duty.

### (b) Article 25's List of High-Risk Duties Is Nonexclusive

In interpreting a statute, the Nebraska Court of Appeals has explicitly interpreted the word "include" to designate a nonexclusive list.[13] Generally, absent other words or a context showing a contrary intent, courts in other jurisdictions have similarly held that a statutory or regulatory list preceded by

---

[13] See *Spracklin v. Spracklin*, 21 Neb. App. 271, 837 N.W.2d 826 (2013). See, also, *Sindelar v. Canada Transport, Inc.*, 246 Neb. 559, 520 N.W.2d 203 (1994).

some variation of the word "include" designates a nonexclusive enumeration of components within the subject matter.[14] It "conveys the conclusion that there are other items includable, though not specifically enumerated by the statutes."[15] Courts usually do not interpret a statutory list that is preceded by the word "includes" as though the statute contained the word "means," and absent a conflicting statutory provision, the word "include" does not create a doubt whether the listed components are exclusive.[16] Additionally, some courts have also explicitly concluded that the word "include" preceding a list *in a contract* has an expansive meaning, absent any language or context showing a more restrictive intent.[17]

We agree. Adopting a rule of nonexclusivity for our contract interpretation cases is consistent with our statutory interpretation cases.[18] It is also consistent with the way we have applied a rule of exclusivity to lists that were not preceded by the word "include." Specifically, we have applied the principle

---

[14] See, *American Surety Co. of New York v. Marotta*, 287 U.S. 513, 53 S. Ct. 260, 77 L. Ed. 466 (1933); *Richardson v. National City Bank of Evansville*, 141 F.3d 1228 (7th Cir. 1998); *Picayune Tribe v. Brown*, 229 Cal. App. 4th 1416, 178 Cal. Rptr. 3d 563 (2014); *Friends for Murray v. Dept. of Human Serv.*, 2014 IL App (5th) 130481, 9 N.E.3d 577, 380 Ill. Dec. 906 (2014); *Connerty v. Metropolitan Dist. Com'n*, 398 Mass. 140, 495 N.E.2d 840 (1986), *abrogated on other grounds, Jean W. v. Com.*, 414 Mass. 496, 610 N.E.2d 305 (1993); *Jackson v. Charlotte Mecklenburg Hosp.*, 768 S.E.2d 23 (N.C. App. 2014); *DEP v. Cumberland Coal Resources, LP*, 102 A.3d 962 (Pa. 2014).

[15] *Argosy Limited v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968), quoted in 2A Norman J. Singer & Shambie Singer, Statutes and Statutory Construction § 47:7 (7th ed. 2014).

[16] See, *Federal Election Com'n v. Mass. Citizens for Life*, 769 F.2d 13 (1st Cir. 1985). But see *Leach v. Monumental Life Ins. Co.*, 118 N.C. App. 434, 455 S.E.2d 450 (1995), *reversed* 342 N.C. 408, 464 S.E.2d 46.

[17] See, e.g., *Ruffin v. RadioShack Corp.*, 49 Kan. App. 2d 92, 305 P.3d 669 (2013); *Empire Mut. Ins. Co. v. Applied Sys. Dev. Corp.*, 121 A.D.2d 956, 505 N.Y.S.2d 607 (1986). See, also, *Enis v. Continental Illinois Nat. Bank*, 795 F.2d 39 (7th Cir. 1986).

[18] See, *Sindelar, supra* note 13; *Spracklin, supra* note 13.

of expressio unius est exclusio alterius (the expression of one thing is the exclusion of the others), when interpreting both statutes and contracts.[19]

[9,10] We recognize that some courts have concluded that the word "include," standing alone, is ambiguous whether the contracting parties meant for the word to be expansive or restrictive.[20] But we are not persuaded by these cases. Concluding that the parties' intent regarding a list is ambiguous if a list is preceded only by the verb "include" is contrary to its plain and ordinary meaning. The word "include" means "1. to contain, embrace, or comprise, as a whole does parts or any part or element . . . 2. to place in an aggregate, class, category, or the like. 3. to contain as a subordinate element; involve as a factor."[21] Contrary to the county's argument, these definitions support the conclusion that enumerated items in a list preceded by the word "include" are normally a part of the whole—not that the parts restrict the whole. Particularly in legal contexts, the "participle *including* typically indicates a partial list," and this meaning holds true whether or not the drafter(s) added emphatic language such as "*including but not limited to.*"[22] Obviously, interpretative aids cannot override the parties' clear intent when a contract is considered as a whole. But the word "include" preceding a list does not indicate an exclusive list absent other language showing a contrary intent.[23]

---

[19] See, e.g., *Jacobson v. Shresta*, 288 Neb. 615, 849 N.W.2d 515 (2014); *Village of Memphis v. Frahm*, 287 Neb. 427, 843 N.W.2d 608 (2014); *O'Gara Coal Co. v. Chicago, M. & St. P. R. Co.*, 114 Neb. 584, 208 N.W. 742 (1926).

[20] See, *Guerrant v. Roth*, 334 Ill. App. 3d 259, 777 N.E.2d 499, 267 Ill. Dec. 696 (2002); *Great Nat. Corp. v. Campbell*, 687 S.W.2d 450 (Tex. App. 1985).

[21] Webster's Encyclopedic Unabridged Dictionary of the English Language 720 (1989).

[22] See Black's Law Dictionary 880 (10th ed. 2014).

[23] Compare, e.g., *Anderson Excavating Co. v. Neth*, 275 Neb. 986, 751 N.W.2d 595 (2008).

At oral argument, the county stated that other provisions in the CBA show that when the parties intended the word "include" to be expansive, they included clarifying language. It argued that the absence of such language in article 25 shows they did not intend the word "include" to be expansive. We disagree that any emphatic language used in other provisions controls the meaning of article 25.

For example, in article 2 of the CBA, the county asserted that its management rights "include, but are not limited to," a specified lists of powers. As stated, however, language added to emphasize that a list is not exclusive is unnecessary because it means the same thing. It does not change the meaning of "include." So the absence of emphatic language in article 25 does not change our analysis of the parties' intent. We conclude that the list of high-risk duties in article 25 is unambiguously nonexclusive. That leads us to whether Timberlake was injured while performing a high-risk duty.

### (c) Article 25 Controls the Meaning of High-Risk Duty

The county argues that "[g]iving first aid is not a high risk activity."[24] But article 25 provides IOD benefits for employees injured while responding to a code, which includes a code green for medical emergencies. By including "responding to a Code" as a high-risk duty, the parties implicitly concluded that the risk of injury while responding to a medical emergency code is sufficient to warrant IOD benefits.

[11] Although Timberlake was not responding to a code green, her conduct—responding to a medical emergency—was within the meaning of a high-risk duty under article 25. Words are known by the company they keep, so a court gives written words grouped together in a list a related meaning.[25]

---

[24] Brief for appellant at 7.

[25] See, *State v. Smith*, 286 Neb. 77, 834 N.W.2d 799 (2013); 11 Samuel Williston, A Treatise on the Law of Contracts § 32:6 (Richard A. Lord ed., 4th ed. 2012).

And her duty to respond to a medical emergency was indistinguishable from her duty to respond to a code green. We note Foxall admitted that an incapacitated officer presents a security risk and that Timberlake had a duty to respond to any emergency she witnessed. So Timberlake unquestionably had a duty to respond to this medical emergency. And if she had been injured while responding to a code green, her injury would have occurred while she was performing a listed high-risk duty under article 25. Because her conduct was indistinguishable from a duty explicitly made a high-risk duty by article 25, we conclude that she was injured while performing an unlisted high-risk duty.

## 2. Court Properly Awarded Attorney Fees Under the Wage Act

The county argues that under § 48-1229(4), IOD benefits are not compensation under the Wage Act. Timberlake argues that IOD benefits are fringe benefits under the act, which the county was obligated to pay her under the CBA. We briefly set out the act's relevant definitions and requirements.

[12] Section 48-1229(4) defines wages as "compensation for labor or services rendered by an employee, *including fringe benefits*, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis." (Emphasis supplied.) Section 48-1229(3) provides that fringe benefits "includes sick and vacation leave plans, disability income protection plans, retirement, pension, or profit-sharing plans, health and accident benefit plans, and any other employee benefit plans or benefit programs regardless of whether the employee participates in such plans or programs." Section 48-1230(1) provides that unless otherwise stated in the act, "each employer shall pay all wages due its employees on regular days designated by the employer or agreed upon by the employer and employee." Under § 48-1229, we will consider a payment a wage subject to the Wage Act if (1) it is compensation for labor or services,

(2) it was previously agreed to, and (3) all the conditions stipulated have been met.[26]

The county admits that in the CBA, the parties agreed to IOD benefits for injured employees who are unable to work. But it argues that the benefits are not wages for the same reason: "The benefit she seeks is not for her labor and services but rather is one negotiated for her by her union in the CBA specifically for injured employees who are unable to provide labor or services."[27] This argument is without merit.

[13] Section 48-1229(4) specifically defines wages to include fringe benefits that an employer agrees to pay on a "time, task, fee, commission, or other basis." And in the case the county relies on, we explained that an employee can earn fringe benefits like sick leave and vacation leave just by rendering services.[28]

[14] Additionally, the list of fringe benefits under § 48-1229(3) is not exclusive. It specifically defines fringe benefits *to include* sick leave, health and accident benefit plans, and any other employee benefit plans. We have implicitly interpreted this provision to include fringe benefits that are not explicitly listed in the statute. Specifically, we have held that the cash value of a life insurance policy can be wages under the act when the evidence shows the employer agreed to pay it to an employee upon his separation of employment. In *Sindelar v. Canada Transport, Inc.*,[29] we held that the cash value was a fringe benefit under § 48-1229(3). We rejected the argument that the policy was an employee benefit plan. Instead, we held that its cash value was deferred compensation. It therefore "amounted to a fringe benefit, as it was in the form of a pension."[30]

---

[26] *Fisher v. PayFlex Systems USA*, 285 Neb. 808, 829 N.W.2d 703 (2013).

[27] Brief for appellant at 14.

[28] See *Fisher, supra* note 26.

[29] *Sindelar, supra* note 13.

[30] *Id.* at 568, 520 N.W.2d at 209.

The same principle applies here. Article 25 provides that a corrections officer injured while performing a high-risk duty "will not be required to use his/her sick leave while recovering from said injury for the first . . . (180) working days of the recovery period or until he/she has reached maximum medical improvement, whichever comes first." This provision shows that IOD benefits are in the same class as sick leave benefits because they are intended to benefit an employee who is unable to work because of sickness or disability. They are not awarded on a time basis, but they are awarded for services rendered if the employee was performing a high-risk duty when injured. The court did not err in concluding that the unpaid benefits were negotiated wages that the county failed to pay. Accordingly, it properly awarded Timberlake attorney fees.

## VI. CONCLUSION

We reject the county's argument that article 25 sets out conjunctive, essential elements that an employee must satisfy to qualify for IOD benefits. We reject its argument that article 25 is ambiguous and conclude that this provision sets out a nonexclusive list of high-risk duties. We therefore do not address the county's argument that the court erred in failing to consider its extrinsic evidence of the parties' intent. We conclude that Timberlake was performing a high-risk duty when she was injured, because her conduct was indistinguishable from conduct that article 25 explicitly listed as a high-risk duty. Finally, we conclude that the court correctly awarded Timberlake attorney fees for collecting unpaid fringe benefits under the CBA.

AFFIRMED.