Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/11/2020 09:09 AM CST

Brian Lassalle, and all others similarly situated,
appellant, v. State of Nebraska and State of
Nebraska, acting through the Nebraska
Department of Health and Human
Services, et al., appellees.

___ N.W.2d ___

Filed September 18, 2020.    No. S-19-810.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

3. **Contracts.** The interpretation of a contract and whether the contract is ambiguous are questions of law.

4. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

5. **Employer and Employee: Employment Contracts: Wages.** A payment will be considered a wage subject to the Nebraska Wage Payment and Collection Act if (1) it is compensation for labor or services, (2) it was previously agreed to, and (3) all the conditions stipulated have been met.

6. **Contracts.** When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them.

7. ____. A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract.

8. ____. A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include.

9. **Contracts: Intent.** A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent.

10. **Contracts.** Extrinsic evidence is not permitted to explain the terms of a contract that is unambiguous.

11. **Moot Question.** A case becomes moot when the issues initially presented in the litigation cease to exist, when the litigants lack a legally cognizable interest in the outcome of litigation, or when the litigants seek to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

Kathleen M. Neary and Vincent M. Powers, of Powers Law, and R. Joseph Barton and Vincent Cheng, of Block & Leviton, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Stephanie Caldwell for appellees.

Heavican, C.J., Miller-Lerman, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

On several occasions between 2016 and 2019, Brian Lassalle, an employee of the Nebraska Department of Health and Human Services (DHHS), sought to take and be paid for leave hours during pay periods in which he also worked his full complement of hours. When DHHS did not allow him to do so, he brought an action against the State alleging various claims, including a violation of the Nebraska Wage Payment and Collection Act (NWPCA), see Neb. Rev. Stat. §§ 48-1228 to 48-1234 (Reissue 2010, Cum. Supp. 2018 & Supp. 2019). He also filed a motion for class certification in which he asked to represent a class of similarly situated DHHS employees. The district court entered summary judgment in favor of the State and denied Lassalle's motion for class certification

as moot. Finding no error on the part of the district court, we affirm.

## BACKGROUND

*Lassalle's Allegations.*

Since 1993, Lassalle has worked for DHHS as a security specialist and medication aide at the Lincoln Regional Center. Lassalle receives pay every 2 weeks and is paid by the hour. As a term of his employment, Lassalle receives paid vacation, sick, and bereavement leave.

In this case, Lassalle sought to bring an action on behalf of himself and other DHHS employees against the State of Nebraska. He alleged that beginning in July 2016, DHHS refused to pay him and other employees for certain vacation, sick, and bereavement leave hours that were approved by supervisors and recorded by the employees. Lassalle asserted that this happened because in July 2016, DHHS began prohibiting employees from taking and being paid for leave hours to the extent that use would cause the employee to exceed more than 40 hours per week if paid weekly or more than 80 hours every 2 weeks if paid on that basis. According to Lassalle, he had previously been paid for leave time during pay periods in which he recorded more than 80 hours of work and leave time. Lassalle alleged that the refusal to pay him for the leave hours at issue violated the NWPCA; the State Tort Claims Act, see Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2014, Cum. Supp. 2018 & Supp. 2019); and the State Contract Claims Act, Neb. Rev. Stat. §§ 81-8,302 to 81-8,306 (Reissue 2014).

*Motions for Class Certification.*

Early in the case, Lassalle filed a motion for class certification. Lassalle defined the class as:

> All current and former full-time non-exempt employees of [DHHS]
>
> (a) who work at one or more of the following facilities: the Lincoln Regional Center, Norfolk Regional Center, Hastings Regional Center, Whitehall Psychiatric

Residential Treatment Facility, Kearn[e]y Youth Reha-
bilitation & Treatment Center, Geneva Youth Rehabilita-
tion & Treatment Center, and Beatrice State Department
Center (collectively "the Facilities"); or

(b) who took paid vacation or sick leave on or after
June 27, 2016[,] while they worked at any of the Facilities
and have not been compensated for all the hours corre-
sponding to such leave.

The district court overruled Lassalle's motion for class
certification. The court reasoned that although the class was
sufficiently numerous, a potential conflict of interest existed
between class members, because if Lassalle prevailed, cer-
tain class members who might prefer to keep rather than use
accrued leave would lose the chance to do so. Alternatively,
the district court found that class certification should be denied
because whether and to what extent any class member would
be entitled to recover would be subject to varying proof.

Lassalle filed a second amended complaint in which he
attempted to address the potential conflict of interest found
by the district court. The second amended complaint asked
that the district court order that class members be allowed to
elect whether they wished to receive back wages or to retain
their accrued leave. Lassalle later filed a renewed motion for
class certification.

*Summary Judgment.*

Prior to the district court's ruling on Lassalle's renewed
motion for class certification, the State filed a motion for sum-
mary judgment. The district court held one hearing in which
it received evidence and heard argument on both motions. We
summarize certain evidence offered in support of and in oppo-
sition to the State's motion for summary judgment below.

The district court received two labor contracts between the
State and the union representing the bargaining unit to which
Lassalle belonged. The first labor contract applied between
July 1, 2015, and June 30, 2017, and the second applied
between July 1, 2017, and June 30, 2019. There was no dispute

that these contracts set forth the terms and conditions of Lassalle's employment.

The relevant provisions of the labor contracts were substantially the same. Each labor contract stated that it "supersedes and cancels all prior practices and agreements, whether written or oral, unless expressly stated to the contrary," and "constitutes the complete and entire agreement between the parties."

In both labor contracts, the State reserved the right "to operate and direct the employees of the State . . . to the extent that such rights do not violate its legal authority, and to the extent such rights are not modified by [the contracts]." The labor contracts provided that those rights included "[t]he right to adopt, modify, change, enforce, or discontinue any existing rules, regulations, procedures or policies."

The labor contracts also contained provisions concerning employees' right to paid leave. Under the labor contracts, employees earned vacation and sick leave according to the duration of their employment. Another provision stated that employees may be granted up to 5 days of bereavement leave in the event of a death in the employee's immediate family. A provision of the labor contracts pertaining to overtime work provided that, with an exception not relevant to Lassalle, "holidays shall be considered as work hours for overtime purposes," but that "[l]eave time (vacation, sick, etc.) shall not be considered as hours worked."

Under the labor contracts, employees received a lump-sum payment for any unused vacation leave upon separation of employment. The labor contracts also provided, however, that employees forfeit any accumulated vacation time in excess of 35 days at the end of each year. The contracts provided that "[v]acation leave should be applied for in advance by the employee and may be used only when approved by the Agency Head and/or his/her Designee. Vacation leave may not be unreasonably denied or deferred so that the employee is deprived of vacation rights." The labor contract in effect between July 1, 2017, and June 30, 2019, contained an additional provision

obligating the employing agency "to provide reasonable opportunity for a State employee to use rather than forfeit accumulated vacation leave." Under that provision, if an employee made a reasonable request to use vacation leave before the leave must be forfeited and that request was denied, the State was obligated to pay the employee the cash equivalent of the forfeited and denied vacation leave.

Both labor contracts provided that all sick leave was forfeited upon separation from employment, except that employees age 55 and older and certain other employees were entitled, upon separation, to a payment equivalent to one-quarter of their accumulated sick leave not to exceed 480 hours. The labor contracts contained no provision regarding payouts for unused bereavement leave, and the parties agree that unused bereavement leave was forfeited at the end of each year. The labor contracts provided that bereavement leave "will not be unreasonably denied."

In addition to the labor contracts, the district court received evidence regarding a DHHS policy concerning the use of leave. The district court received an affidavit of DHHS' chief of staff, in which she stated the following:

> Since at least 2013, it has been the policy of the DHHS that employees are only allowed to report more than 40 hours of time in a single work period (or more than 80 hours in a two-week work period) when actually working overtime. DHHS hourly employees are not allowed to use leave time to exceed 40 hours in a single work period or 80 hours in a two-week work period. For example, an employee that works a 40 hour work week cannot report 35 hours of work and 8 hours of leave time. Only 5 hours of leave time may be used in this situation.

Other employees of DHHS also testified as to this policy. Additionally, the policy was reflected in a document received by the district court entitled "KRONOS Quick Start Guide for Employees" (KRONOS guide). KRONOS is a time and attendance software used by DHHS to track employees' worktime

and leave usage. The KRONOS guide, which indicated it was updated in 2013, provided:

> Employees are only allowed to report more than 40 hours of time in a single week when working overtime. Employees are not allowed to use leave time to exceed 40 hours in the week. For example, an employee cannot report 35 hours of work and 8 hours of vacation. Only 5 hours of vacation may be used in this situation.

The district court also received evidence that it came to the attention of DHHS in 2016 that at some DHHS facilities, including the Lincoln Regional Center, some employees were recording and being paid for leave time in excess of the total hours allowed in the employees' pay periods. In response to that information, on June 8, 2016, the deputy human resources director at DHHS emailed a memorandum to all DHHS supervisors. The memorandum stated that "[e]mployees cannot have more than 40 hours in any work week unless they have **physically worked** more than 40 hours." (Emphasis in original.) It went on to provide a similar example to the one noted in the KRONOS guide: "If an employee works 34 hours in a week, and submits a leave request for 8 hours—the supervisor should only approve 6 hours." The district court also received as an exhibit a document indicating that on July 13, Lassalle, along with others, was forwarded an email from human resources staff at the Lincoln Regional Center stating that if a full-time employee actually worked 80 hours, paid leave was unavailable.

The district court also received at the summary judgment hearing interrogatory answers of Lassalle in which he identified 11 different days between September 2016 and January 2019 on which he claimed that his supervisor approved and he took and recorded vacation, sick, or bereavement leave but was denied pay. According to Lassalle, he was denied approximately $1,300 as a result of DHHS' refusal to allow him to take and be paid for the leave at issue.

*District Court Order on Summary Judgment
and Class Certification.*

The district court issued an order in which it sustained the State's motion for summary judgment and overruled Lassalle's motion for class certification. The district court addressed the State's summary judgment motion first. In analyzing Lassalle's NWPCA claim, the district court considered the labor contracts and found that they contained no agreement to pay Lassalle for leave time exceeding 80 hours in a pay period. Without evidence of such an agreement, the district court concluded the State was entitled to judgment as a matter of law on his NWPCA claim. The district court also found the State was entitled to summary judgment on Lassalle's claims under the State Tort Claims Act and the State Contract Claims Act.

In light of its finding that the State was entitled to summary judgment, the district court determined that Lassalle's renewed motion for class certification was moot. Even so, the district court, "for the sake of judicial efficiency," went on to explain why it would overrule the motion for class certification even if it had not entered summary judgment against Lassalle. It stated that although Lassalle had attempted to remedy the issues the district court identified when it denied his initial motion for class certification, Lassalle did not explain why the evidence and argument he relied upon were not offered at the time of the first motion. The district court also noted that it believed class certification at that point would result in unacceptable delay.

## ASSIGNMENTS OF ERROR

Lassalle assigns 12 errors on appeal, all of which relate to the entry of summary judgment in favor of the State and the denial of his motion for class certification. He assigns, consolidated and restated, that the district court erred in (1) sustaining the State's motion for summary judgment on his NWPCA claim and (2) denying his motions for class certification.

## STANDARD OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Drought v. Marsh*, 304 Neb. 860, 937 N.W.2d 229 (2020). An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019).

[3,4] The interpretation of a contract and whether the contract is ambiguous are questions of law. *Timberlake v. Douglas County*, 291 Neb. 387, 865 N.W.2d 788 (2015). An appellate court independently reviews questions of law decided by a lower court. *Fisher v. PayFlex Systems USA*, 285 Neb. 808, 829 N.W.2d 703 (2013).

## ANALYSIS

*NWPCA Claim.*

As mentioned above, Lassalle asserted multiple theories of recovery in the district court. On appeal, however, Lassalle challenges only the entry of summary judgment in favor of the State on his NWPCA claim. We thus limit our analysis to that claim.

Before turning to the NWPCA itself, however, we pause to clarify the basis of Lassalle's claim and to identify the issues that are in dispute. As explained above, Lassalle contends that during several pay periods between 2016 and 2019, he sought to take and be paid for leave time even though the combined total of his work and leave hours exceeded 80. This apparently came about as a result of Lassalle's receiving approval to take time off on days he was scheduled to work, but also agreeing to work additional hours at other times during the same pay period. Lassalle would then record both a full 80 hours of work and the additional leave hours. The State does not

dispute that it did not pay Lassalle for leave hours to the extent they exceeded 80 hours on those occasions.

Lassalle makes a number of concessions as well. He does not dispute that DHHS never denied him pay for hours he worked and that in each of the instances in which DHHS did not permit him to take or be paid for leave, it did not deduct those hours from his leave balances. Lassalle also admits that he had never lost or forfeited any vacation or sick leave under the labor contracts. The issue in this case is thus whether the State violated the NWPCA when it refused to permit Lassalle to take and be paid for leave hours when doing so would cause him to exceed 80 hours of work and leave during a pay period. With that background established, we turn to the NWPCA.

[5] The NWPCA essentially permits an employee to sue his or her employer if the employer fails to pay the employee's wages as they become due. *Pick v. Norfolk Anesthesia*, 276 Neb. 511, 755 N.W.2d 382 (2008). "Wages" are defined as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis." § 48-1229(6). On the basis of this statutory language, we have held that a payment will be considered a wage subject to the NWPCA if (1) it is compensation for labor or services, (2) it was previously agreed to, and (3) all the conditions stipulated have been met. *Pick v. Norfolk Anesthesia, supra*.

It is clear that sick and vacation leave plans like those provided under the labor contracts qualify as compensation for labor or services. The NWPCA specifically provides that sick and vacation leave plans are "fringe benefits" and thus included within the act's definition of "wages." See § 48-1229(4). See, also, *Timberlake v. Douglas County*, 291 Neb. 387, 865 N.W.2d 788 (2015).

But establishing that the leave benefits qualify as compensation for labor or services proves only the first element of an NWPCA claim. In order to prove the other two elements,

Lassalle was also required to show that the State previously agreed to pay him for the leave at issue and that all the conditions stipulated to receive that pay were met. It was here that the district court found that Lassalle's NWPCA claim fell short: it found that the State did not agree in the labor contracts that it would pay Lassalle for vacation, sick, or bereavement leave to the extent doing so would allow Lassalle to be paid for more than 80 hours during a pay period. Lassalle offers a number of reasons why he believes this was erroneous, but, as we will explain, we are not persuaded.

Lassalle first argues that the district court erred by giving any consideration to whether there was a prior agreement to pay him for the leave at issue. Lassalle asserts that under the NWPCA, the question of whether there was an agreement to pay compensation is an issue of fact that should not have been resolved at summary judgment. We disagree. Lassalle brought his claim under the NWPCA, but he alleged in his operative complaint that his right to payment arose out of the labor contracts. When, as here, a party's NWPCA claim is premised on a written contract, the meaning of that contract may present a question of law to be decided by the court. As we have previously observed, "[i]n virtually every case brought under the [NWPCA], the employee and the employer dispute whether wages are owed based on an existing contract or agreement of some sort. The court then determines which party's interpretation of the agreement is correct." *Professional Firefighters Assn. v. City of Omaha*, 290 Neb. 300, 307, 860 N.W.2d 137, 142 (2015). A court may make such a determination because the meaning of an unambiguous contract is a question of law. See *Kasel v. Union Pacific RR. Co.*, 291 Neb. 226, 865 N.W.2d 734 (2015). That is what we understand the district court to have done here.

[6-9] Neither do we agree with Lassalle that the district court was incorrect when it determined that the labor contracts did not contain an agreement to pay Lassalle for leave hours in excess of 80 hours in a pay period. In reviewing the district

court's interpretation of the labor contracts, we are guided by familiar principles. When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014). A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract. *Kercher v. Board of Regents*, 290 Neb. 428, 860 N.W.2d 398 (2015). A court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. *Ray Anderson, Inc. v. Buck's, Inc.*, 300 Neb. 434, 915 N.W.2d 36 (2018). A court should avoid interpreting contract provisions in a manner that leads to unreasonable or absurd results that are obviously inconsistent with the parties' intent. *Timberlake v. Douglas County*, 291 Neb. 387, 865 N.W.2d 788 (2015).

Lassalle cannot point to any provision in the labor contracts in which the State agreed that employees could take and be paid for leave hours in addition to being compensated for a fully worked pay period. The labor contracts did provide that "[v]acation leave may not be unreasonably denied or deferred so that the employee is deprived of vacation rights." This provision, however, does not give employees a right to use vacation leave in any manner they choose or a right to be paid for vacation leave during pay periods in which they actually work a full schedule. In any event, we do not see how this provision could be of any assistance to Lassalle, because it refers only to employees who are denied vacation leave *and* are thereby deprived of vacation rights. Lassalle acknowledges that he has never forfeited any vacation leave.

The provision in the contracts stating that "[b]ereavement leave will not be unreasonably denied" is also of no assistance to Lassalle. Like the language regarding vacation leave, this provision does not reflect an agreement that employees will be

paid for bereavement leave to the extent it would cause them to exceed their normal paid hours during a pay period.

The labor contracts did contain a provision that made clear that leave time was not to be counted as hours worked for overtime purposes. The district court relied on this provision in the course of concluding that there was no agreement to pay Lassalle for the leave time at issue. Lassalle criticizes the district court's reliance on this provision, arguing that it is irrelevant because he did not claim an entitlement to overtime pay. But even if Lassalle is correct that the labor contracts' overtime provisions do not directly address his claim, it remains true that no provision of the labor contracts, outside of those dealing with overtime, refers to employees' right to be paid for more than 40 hours if paid weekly or more than 80 hours if paid every 2 weeks.

Not only did the labor contracts not contain any language suggesting an agreement to pay employees leave time in a pay period in which they worked a full schedule, they contained language giving DHHS the authority to enforce its policy prohibiting employees from using leave time in this fashion. As noted above, in the labor contracts, the State reserved the right to direct employees "to the extent such rights [were] not modified by [the labor contracts]," and that this included the "right to adopt, modify, change, enforce, or discontinue any existing rules, regulations, procedures, or policies."

Because the labor contracts contained no provision guaranteeing employees the right to use leave time to the extent that doing so would cause them to exceed their normal hours during a pay period, the State could, within the terms of the labor contracts, enforce its policy prohibiting employees from doing so. And while Lassalle strives to create a genuine issue of material fact regarding the policy, we do not see one. Lassalle principally points to deposition testimony from a longtime DHHS payroll processor that she had to change the way she processed payroll in response to DHHS' June 2016 memorandum regarding the usage of leave time. This testimony is undoubtedly

evidence that DHHS did not consistently enforce its policy prior to June 2016, but that point is not in question. We do not believe this evidence creates a genuine dispute of material fact as to whether such a policy existed or that the labor contracts authorized DHHS to enforce it.

Lassalle also argues that the State could not enforce its policy in the instances at issue, because a supervisor approved his taking of leave, he did not work on the days leave was approved, and he recorded that leave on his timesheets. He apparently takes the position that the State agreed to pay leave when those conditions were met. But while those steps may be necessary conditions to an employee's receiving leave pay under the labor contracts, Lassalle points to nothing in the labor contracts that provides those are sufficient conditions to receiving leave pay.

In the instances at issue, Lassalle may have received supervisor approval to miss work on a particular day he was scheduled, but under the policy adopted by DHHS—which, as we have discussed above, the labor contracts authorized it to enforce—he was not permitted to use leave time to the extent it would cause his total hours to exceed 80 in a pay period. Further, there is no dispute that DHHS did not, in fact, deduct any leave hours from Lassalle's accumulated totals in the instances at issue. So while Lassalle may not have received leave pay for some days in which his supervisor approved his absence from work, he did not actually use leave hours on those days either. There is nothing in the labor contracts indicating that employees could, prior to separation from employment and during a pay period in which they were compensated for a full 80 hours, also receive pay for leave hours that were not used.

[10] Lassalle makes other arguments that the district court erred by granting summary judgment on his NWPCA claim, but in light of our conclusion that the district court correctly concluded that the labor contracts contained no agreement to pay him for the leave at issue, they can be dispensed with

quickly. Lassalle argues, for example, that the district court ignored deposition testimony of certain current and former state employees. He argues that this testimony was favorable to his position there was an agreement to pay him for the leave at issue and that by not addressing it, the district court failed to view the evidence in the light most favorable to him as the nonmoving party. Although we understand much of the testimony Lassalle relies upon to recognize only a general right of state employees to accrue and use leave benefits, it is not necessary for us to parse that testimony in detail, because it is extrinsic to the labor contracts. Extrinsic evidence is not permitted to explain the terms of a contract that is unambiguous. *Ray Anderson, Inc. v. Buck's, Inc.*, 300 Neb. 434, 915 N.W.2d 36 (2018).

Finally, Lassalle argues that the district court erred by focusing exclusively on the labor contracts. In both his briefs and at oral argument, Lassalle emphasized that he brought an NWPCA claim and not a claim for breach of the labor contracts. But as we have discussed, to prevail on an NWPCA claim, the employee must show an agreement to pay the wages at issue, and Lassalle alleged that the labor contracts contained such an agreement. Given this allegation, we cannot fault the district court for analyzing the labor contracts to determine if they contained an agreement that would support Lassalle's NWPCA claim. Further, Lassalle has not identified any other agreement in which the State committed to pay him for leave under the circumstances at issue here.

The district court did not err by concluding as a matter of law that there was no prior agreement to pay Lassalle for the leave at issue and sustaining the State's motion for summary judgment on Lassalle's NWPCA claim.

*Class Certification.*

Lassalle also argues that the district court erred when it overruled his motion for class certification. The district court concluded that because it sustained the State's motion for

summary judgment, Lassalle's motion for class certification was moot. We agree.

[11] A case becomes moot when the issues initially presented in the litigation cease to exist, when the litigants lack a legally cognizable interest in the outcome of litigation, or when the litigants seek to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *State v. Dunster*, 278 Neb. 268, 769 N.W.2d 401 (2009). Lassalle sought to represent a class of DHHS employees in an action against the State, but because the State was entitled to summary judgment on those claims, he could no longer do so. The class certification issue was moot. See, e.g., *Spaulding v. United Transp. Union*, 279 F.3d 901 (10th Cir. 2002) (holding that entry of summary judgment in favor of defendants mooted plaintiffs' argument that district court erred in denying motion for class certification); *Jibson v. Michigan Educ. Ass'n-NEA*, 30 F.3d 723, 734 (6th Cir. 1994) ("because we affirm the district court's grant of [the defendant's] motion for summary judgment, we also find that the district court did not err in subsequently refusing to rule on the motion for class certification, and in not granting any relief to the other purported class members"). See, also, *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937 (7th Cir. 1995) (explaining that entry of summary judgment in favor of defendant moots motion for class certification if grounds for summary judgment would apply equally to other members of proposed class).

## CONCLUSION

Because the district court did not err by sustaining the State's motion for summary judgment on Lassalle's NWPCA claim or by denying his motion for class certification as moot, we affirm.

AFFIRMED.

CASSEL, J., not participating.