Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/02/2026 08:11 AM CDT

Daniel C. Bennett, appellee and cross-appellant,
v. DeeAnn J. Bennett, appellant
and cross-appellee.

___ N.W.3d ___

Filed June 2, 2026.    No. A-25-214.

1. **Divorce: Property Division: Alimony: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of property division and alimony. These determinations are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.
2. **Divorce: Property Division: Appeal and Error.** The date of valuation of a marital estate is reviewed for an abuse of the trial court's discretion.
3. **Divorce: Property Division.** In a marital dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate equitably between the parties.
4. ____: ____. Regarding classification of settlement funds, compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by marital partnership. Compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate.
5. **Divorce: Property Division: Proof.** The burden of proving that all or a portion of the settlement is nonmarital rests on the spouse making the claim.

6. **Divorce: Property Division.** Nonmarital property becomes marital when nonmarital property is inextricably mixed, or commingled, with marital property. Nonmarital property remains nonmarital when it is segregated or traceable into its product.

7. **Divorce: Property Division: Equity.** The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided.

8. **Divorce: Property Division: Appeal and Error.** The date upon which a marital estate is valued must be rationally related to the property composing the marital estate and the property being divided.

9. **Divorce: Property Division: Taxes.** Income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt.

10. **Divorce: Property Division: Proof.** The burden to show that a debt is nonmarital is on the party making that assertion.

11. **Divorce: Property Division.** There is no mathematical formula by which property awards can be precisely determined, but, generally, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

12. ____: ____. In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities of the situation.

13. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

14. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result.

Appeal from the District Court for Lincoln County: Michael E. Piccolo, Judge. Affirmed as modified.

Kyle J. Long, of Simmons Olsen Law Firm, P.C., L.L.O., for appellant.

Timothy P. Brouillette, of Brouillette, Troshynski, Kingston & Jackson, P.C., L.L.O., for appellee.

Riedmann, Chief Judge, and Pirtle and Freeman, Judges.

Freeman, Judge.

## I. INTRODUCTION

DeeAnn J. Bennett appeals from the decree entered by the district court for Lincoln County, Nebraska, dissolving her marriage to Daniel C. Bennett. DeeAnn argues that the district court erred in its valuing of one of Daniel's bank accounts.

Daniel cross-appeals. Daniel argues that the district court erred in classifying a portion of his settlement funds as marital, classifying his 2023 tax debt as nonmarital, and awarding alimony. For the reasons explained below, we affirm the district court's order as modified.

## II. BACKGROUND

Daniel and DeeAnn were married on November 15, 2003. Daniel filed his complaint for dissolution of marriage on August 7, 2023. The parties have two children, both of whom were adults at the time of trial and entry of the decree.

Trial was held on January 13, 2025. At trial, the parties adduced the following testimony and evidence regarding Daniel's Union Pacific Railroad (Union Pacific) settlement, Daniel's 2023 tax debt, and alimony.

### 1. Union Pacific Settlement

For the past 17 years, Daniel has worked as a Union Pacific machinist. His wrist was injured while employed. As a result of his injury, Daniel is unable to bend his wrist. He briefly stopped working at Union Pacific from June 19, 2022, until early February 2023. In April 2023, he was cleared by his doctor to resume all regular activities.

Daniel testified that, in settlement negotiations with Union Pacific, "I told them when everything is said and done[,] to make me happy for my injury and the pain that I still go through every day[,] I want a check for $120,000 in my bank account." He further stated, "So that's why they were willing

. . . to pay me that amount[,] so they know they don't have to pay for another surgery on this wrist anymore." Daniel received a total settlement of $150,000 from Union Pacific due to his wrist injury. An apportionment agreement page was received into evidence. The entire settlement agreement was not offered at trial.

In the apportionment agreement, an amount was allocated to "time lost" so that Daniel could receive credit for months of service toward retirement. The apportionment agreement stated that $18,531.20 of the settlement was apportioned to "time lost." Daniel was unsure how $18,531.20 was calculated.

The remaining portion of the settlement was for "other factors." Daniel stated that this portion was for pain and suffering and for any other future medical expenses associated with his wrist. The amount of $12,474 of the settlement was withheld to pay the U.S. Railroad Retirement Board for the Railroad Unemployment Insurance Act benefits that were paid. Before the funds were deposited, Daniel made an additional payment of $2,325.67 to the U.S. Railroad Retirement Board for taxes associated with the time lost.

Daniel received a net settlement of $123,770.52 that was deposited into the parties' Platte Valley Bank (Platte Valley) joint checking account on May 30, 2023. The $123,770.52 was listed as "Non-Cash Earnings" on Daniel's paystub. Around the same time, additional income was going into the Platte Valley joint checking account from other sources.

After the funds were deposited, Daniel stated that about $20,000 was used to pay DeeAnn's credit cards and about $25,000 was used to pay his credit cards. For the month of June 2023, the Platte Valley joint checking account had total debits of $128,697.66.

Daniel testified, "[W]e needed to get some of this money out of the checking account so we wouldn't blow it all, and [I had] her put a little of it in the savings account." On June 9, 2023, Daniel withdrew $38,000 from the Platte Valley joint checking account and placed it into the parties' joint Wells

Fargo account that no longer existed at the time of trial. On June 12, $37,000 was transferred from the Platte Valley joint checking account to a Platte Valley savings account held only in DeeAnn's name that Daniel was able to access.

On August 2, 2023, Daniel withdrew $35,000 from the Wells Fargo account, which amount he testified was settlement funds. Daniel stated that he placed the $35,000 into a new bank account at First National Bank of Omaha (FNBO), which account was held solely in his name. Around the beginning of August, Daniel transferred $25,000 from DeeAnn's Platte Valley savings account back into their Platte Valley joint checking account, which he then transferred into his FNBO account. His FNBO account also contained a $10,000 gift from his father. Daniel offered a few screenshots and statements in support of his testimony regarding the transactions.

Daniel testified that his FNBO account had approximately $16,594.92 on the date of trial. Daniel also acknowledged that on the date he filed his complaint for dissolution of marriage, he had approximately $70,000 in his FNBO account.

Because of "the absence of more substantive proof," the district court classified the settlement funds as marital. The district court recognized the apportionment agreement did not specify whether the funds were for economic or noneconomic losses. The district court also observed that Daniel was cleared to return to work with no restrictions or limitations and to resume all regular activities. Even if the settlement funds were found to be nonmarital, the district court determined that there was insufficient tracing to find any remaining settlement funds as nonmarital.

The district court identified the date the complaint for dissolution of marriage was filed, or August 2023, as the valuation date it would use for valuing property and resolving disputes. Notwithstanding, the district court awarded Daniel's FNBO account to Daniel at a value on the trial date of $16,594.92.

## 2. Tax Debt

Daniel testified that the parties "didn't file joint taxes last year." As a result, Daniel owed approximately $6,250 for taxes. The district court did not include the tax debt in the marital estate because it arose after the parties separated.

## 3. Alimony

At trial, DeeAnn pursued a claim for alimony. Both parties were in their midfifties. The parties each testified to their education and employment experience.

### (a) Daniel's Testimony

Daniel has a bachelor's degree in education and some welding certifications. Daniel testified that when he first married DeeAnn, she was employed full time at about the same wages as him. According to Daniel, the parties had equal earnings for about the first 5 years of their marriage.

Daniel stated that DeeAnn received an associate's degree in a licensed practical nurse (LPN) program in 2002 or 2003. However, DeeAnn never practiced as a nurse, because she stayed home to take care of their ill son after he was born in 2005. But considering the entire marriage, Daniel testified that the parties equally helped to raise the children while both parties worked.

According to Daniel, DeeAnn currently has a cosmetology license, and at one point during their marriage, she had a lease on a hair salon for a few years.

In January 2019, Daniel moved to North Platte, Nebraska, to continue working for Union Pacific. DeeAnn and the children did not move to North Platte so that the children could graduate from high school in Gering, Nebraska. Though the parties were living separately, Daniel continued to pay their marital expenses.

While Daniel testified to being employed at Union Pacific, he was not currently working because of several health concerns. At the time of trial, he had not worked at Union Pacific since July 2024. He is unable to return to work until

his treatment is completed. He testified he hoped to go back to work any day once he is cleared by his doctors. He would like to continue working at Union Pacific until his retirement. Daniel claimed that DeeAnn was "fairly healthy," except for some thyroid and blood pressure issues.

In total, Daniel claimed approximately $6,289.21 in monthly expenses. His 2024 paystubs reflected a monthly gross income of approximately $7,478. Daniel listed his gross monthly income at $10,580 and his net monthly income at $7,480 in his interrogatories from December 2023. Daniel's tax returns received into evidence revealed he made a gross monthly income of approximately $8,888 in 2022 and $11,801 in 2021. Daniel proposed that he pay DeeAnn $500 a month in alimony for 5 years.

### (b) DeeAnn's Testimony

DeeAnn testified that she stayed home to take care of their son for 2 years. Although she has an associate's degree in an LPN program, DeeAnn is unable to "sit[] for the boards" to become an LPN because too much time has passed. She would have to complete the whole course over again to become licensed. DeeAnn also does not currently make money from her cosmetology license, nor could she, because working as a hairdresser causes her back pain.

DeeAnn testified that she works both a full-time job and a part-time job in Gering. In the future, she did not expect to earn as much at her part-time job because her employer lost a contract.

In total, DeeAnn claimed that she made $3,783 in monthly income and that Daniel made $11,254 in monthly income. She claimed approximately $4,872 in monthly expenses. DeeAnn proposed that she receive $1,000 a month in alimony for 10 years.

### (c) District Court's Ruling

The district court found Daniel's expenses to be $3,755. The district court relied on Daniel's interrogatory answers in

determining that he made $10,580 in gross monthly income and $7,480 in net monthly income. Therefore, Daniel had approximately $3,725 in disposable income. While Daniel was not working at the time of trial due to medical issues, the district court noted that Daniel expected and desired to return to work soon.

The district court found that DeeAnn's gross monthly income was $4,228 with approximate net income of $3,473. While DeeAnn estimated her expenses at $4,872, the district court "discounted some of DeeAnn's monthly expenses based on the logical premise that the adult children are beneficiaries" because the adult children live with her.

The district court found that Daniel had disposable income and that DeeAnn's expenses exceeded her income. The court also determined that it was unlikely that DeeAnn would be able to earn more in her preretirement years based on her employment history.

Regarding the relevant factors, the district court found that the contributions to the marriage favored Daniel's position. However, according to the district court, the length of the marriage, the disparity of the incomes, and the relative economic circumstances in this case favored an award of alimony closer to DeeAnn's request. The district court also found that Daniel had "dutifully paid temporary alimony of $1,000.00 for 16 consecutive months." Ultimately, the district court ordered Daniel to pay DeeAnn $1,000 a month in alimony for 90 additional months.

### 4. Motions for New Trial

After the district court entered its decree of dissolution of marriage, both parties moved for new trial or, in the alternative, to alter or amend the decree. Daniel argued that he should have been given credit for the tax debt that was incurred during the marriage and that his remaining settlement funds were nonmarital. DeeAnn argued that the FNBO account should

have been valued at $70,062.76, based on the valuation date of August 2023.

The district court rejected Daniel's argument that the tax debt was marital. The district court found that the tax debt was nonmarital because it was incurred postseparation. The district court supported its determination with the reasoning that Daniel's tax debt was incurred from his separate filing and is solely his responsibility.

Additionally, the district court rejected Daniel's argument that the settlement funds were nonmarital. The district court relied upon the apportionment agreement language that stated, "It is agreed that the above apportionment is made only for provisions of the Railroad Retirement Act, Railroad Unemployment Insurance Act and the Railroad Retirement Tax Act relating to 'time lost,' and for no other purpose . . . ." Based on this language, the district court determined the agreement did not contemplate a noneconomic loss. Therefore, the remaining settlement funds were marital.

The district court rejected DeeAnn's argument that the district court should have used the August 2023 valuation date for Daniel's FNBO account because it found that it would be inequitable to accept the higher balance on August 2023, since a significant portion of the settlement funds were used to pay marital debt.

DeeAnn appeals, and Daniel cross-appeals.

### III. ASSIGNMENTS OF ERROR

Both parties assign, restated, that the district court erred in the equitable division of a portion of Daniel's settlement funds.

Daniel separately assigns, restated and reordered, that the district court erred in (1) classifying his 2023 tax debt as nonmarital and (2) awarding alimony.

### IV. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's

determinations of property division and alimony. See *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025). These determinations are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. See *id.*

[2] The date of valuation is reviewed for an abuse of the trial court's discretion. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Backhaus v. Backhaus, supra.* When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

[3] Before we begin, we set out the legal framework for evaluating an equitable division of property. Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Backhaus v. Backhaus, supra.* In a marital dissolution action, the equitable division of property is a three-step process. *Id.* The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. *Id.* The extent to which the property is marital versus nonmarital presents a mixed issue of law and fact. *Id.* The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is generally a legal question. See *id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate equitably between the parties. See *id.*

### 1. Union Pacific Settlement

#### (a) Marital or Nonmarital Classification

Daniel assigns and argues, combined, that the balance of the FNBO account was traced to the Union Pacific settlement which the district court erroneously classified as marital property. We agree the district court abused its discretion in its classification of the settlement funds but find no abuse of discretion in its determination that Daniel failed to trace the proceeds.

In determining that the settlement funds were marital, the district court relied on the apportionment agreement language that stated, "It is agreed that the above apportionment is made only for provisions of the Railroad Retirement Act, Railroad Unemployment Insurance Act and the Railroad Retirement Tax Act relating to 'time lost,' and for no other purpose . . . ." We note that what "time lost" is or how it was calculated was not made clear from the record. However, if we use this language to conclude that there was no noneconomic purpose for the settlement, then we fail to recognize that a portion of the funds was allocated to "other factors," which, according to Daniel, represented pain and suffering. When reading the agreement as a whole, it is reasonable to conclude that some of the remaining funds for "other factors" included a noneconomic purpose. See *Lassalle v. State*, 307 Neb. 221, 948 N.W.2d 725 (2020) (finding contract must receive reasonable construction and must be construed as whole, and if possible, effect must be given to every part of contract).

[4] Regarding classification of settlement funds, compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by marital partnership. See *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of post-divorce earning capacity should not equitably be included in

the marital estate. *Id.* It is not at all uncommon for personal injury settlement agreements to be silent regarding allocation, and we soundly reject any suggestion that such silence compels the conclusion that the entire settlement must be classified as marital property. *Id.*

District court judges are well acquainted with personal injury evidence and damages and are called upon regularly to determine and allocate such damages. *Id.* Neither mathematical allocation of settlement proceeds nor expert testimony as to allocation is required as trial courts instead allocate damages based on personal testimony and other evidence. See *id.*

[5] The burden of proving that all or a portion of the settlement is nonmarital rests on the spouse making the claim. *Id.* The burden of proof in civil cases requires only the greater weight of the evidence. See *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025). The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true. *Id.* If the burden is not met, the presumption remains that the proceeds from the settlement are marital property. *Marshall v. Marshall, supra*.

The Nebraska Supreme Court discussed a similar settlement division in *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999). The husband in *Parde v. Parde, supra,* worked for the railroad and received a settlement due to a work-related injury. The cash payment from the settlement was apportioned into two components: "'time lost'" and "'other factors.'" *Id.* at 103, 602 N.W.2d at 659. The wife argued that the husband failed to prove by direct evidence what amount was specifically designated for nonmarital purposes. *Parde v. Parde, supra*. However, because the husband provided evidence of the value of past marital wages, the court determined that the remaining portion was nonmarital. See *id.*

Regardless of the computation used to determine the marital amount of the settlement funds, the court determined that the marital estate received substantially more funds than what was needed to compensate for past marital wages. See

*id.* As a result, the marital estate received a windfall. See *id.* The court determined that classifying any remaining funds as marital would deprive the husband of a "substantial right and a just result." *Id.* at 112, 602 N.W.2d at 664 (citing *Bondi v. Bondi*, 255 Neb. 319, 586 N.W.2d 145 (1998)).

Likewise, here, Daniel received settlement funds apportioned to "time lost" and "other factors." Daniel was unable to prove by direct evidence what amount of the settlement was specifically designated for nonmarital purposes. He claimed that the remaining portion for "other factors" was for pain and suffering and for any other future medical expenses associated with his wrist. Daniel testified that Union Pacific settled with him to avoid having to pay any future medical expenses. These other factors did not diminish the marital estate and support the idea that a portion of the settlement was nonmarital.

Therefore, based on our de novo review, we determine a portion of the settlement funds was nonmarital, so the district court abused its discretion in finding otherwise. However, the district court further determined that there was insufficient tracing of the remaining settlement funds to set aside as nonmarital.

[6] Nonmarital property becomes marital when nonmarital property is inextricably mixed, or commingled, with marital property. See *White v. White*, 320 Neb. 256, 26 N.W.3d 924 (2025). Nonmarital property remains nonmarital when it is segregated or traceable into its product. See *id.*

On May 30, 2023, $123,770.52 of settlement funds were deposited into the Platte Valley joint checking account. Daniel testified that most of this money was used on marital debts. For the month of June, the Platte Valley joint checking account had more debits, a total of $128,697.66, than the settlement funds deposited. From there, Daniel stated he withdrew some money to not "blow it all" and placed it in various accounts, including another joint account and an account only in DeeAnn's name.

While Daniel offered some proof of tracing, we find that the district court's determination that the funds were not traceable was not clearly untenable based on the significant transactions that occurred in the Platte Valley joint checking account and the various placements of funds. Daniel also offered very little evidence regarding the transaction history of the accounts the funds were transferred between, except for a few screenshots and statements. Therefore, the district court did not err in classifying the FNBO account as marital because any nonmarital portion became commingled with marital property.

### (b) Date of Valuation

We will next address the date of valuation of the remaining settlement funds in the FNBO account.

DeeAnn argues that the FNBO account should be valued at $60,000 as of the date of filing, or August 2023. She argues that the $60,000 was marital property as it was derived from the remainder of Daniel's marital settlement funds or at least was commingled with marital property. She concedes that the $10,000 gift from Daniel's father was nonmarital.

The district court valued the FNBO account at $16,594.92 as of the date of trial, January 2025. Daniel concedes that a majority of the settlement funds were used for marital debt and is requesting only that the remaining funds left to him be considered nonmarital.

[7,8] The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). It is well settled that, generally, the date upon which a marital estate is valued must be rationally related to the property composing the marital estate and the property being divided. See *id.* We have declined to tie the hands of the district court and mandate that it must use only one particular valuation date in equitably dividing the marital estate. *Id.*

In *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019), the Nebraska Supreme Court found that the district court did not abuse its discretion when it used various valuation dates because the valuation dates were rationally related to the property. Some property was valued at the date of separation because the assets no longer benefited both parties. See *id.* Other property was valued at the date of trial because the assets were being used by both parties until the time of trial. See *id.* Each reason was rationally related to the property. See *id.*

Here, the district court found that it would be inequitable to accept the higher balance in August 2023 because a significant portion of the settlement funds were used for marital debt. By not attributing Daniel with the $60,000 valued in August 2023, the district court implicitly awarded Daniel a nonmarital portion of his settlement.

Therefore, we find no abuse of discretion by the district court because there was a rational basis to value the FNBO account as of the date of trial, or January 2025.

## 2. TAX DEBT

Daniel argues that his tax debt should have been included in the marital estate.

The district court did not make a specific finding of when the tax debt occurred, only that it arose postseparation. The parties were married but living separately beginning in 2019, and Daniel filed the present action in August 2023. Daniel testified the tax debt was due to the filing from "last year," or 2024. DeeAnn claimed the debt resulted from the 2023 tax return filing. No tax returns were submitted to the district court from either 2023 or 2024. From our de novo review, we determine that the tax debt occurred from Daniel's 2023 tax returns that were filed in 2024. At the time of trial in January 2025, it would be unreasonable to assume that Daniel meant to refer to his 2024 taxes.

As such, Daniel's tax debt arose due to his 2023 income. The district court determined that the tax debt was nonmarital

because it was incurred postseparation and because it was incurred from Daniel's separate tax filing that was solely his responsibility.

We have expressly declined to adopt a rule requiring that debts must be incurred before separation to be considered marital. *Radmanesh v. Radmanesh, supra.* Even though the parties were living separately, they still operated as if they were married, as Daniel continued to pay for marital debts. Therefore, the fact that the tax debt was incurred postseparation does not support the district court's determination to classify the entire tax debt as nonmarital. Additionally, a separate tax filing in itself does not make a tax debt nonmarital. See *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000).

[9,10] Income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt. *Id.* The burden to show that a debt is nonmarital is on the party making that assertion. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021). DeeAnn did not provide any other evidence to support her burden of proving the tax debt was nonmarital. Therefore, the district court abused its discretion in excluding the tax debt from the marital estate.

The next step is to value the marital debt. Marital debt can be a mixture of marital property and nonmarital property. See *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). By using the valuation date of August 2023, we determine Daniel accumulated marital income and tax debt for 7 out of the 12 months in 2023. See *Edmonds v. Edmonds*, No. A-13-051, 2013 WL 5976336 (Neb. App. Nov. 12, 2013) (selected for posting to court website) (prorating debt). Therefore, seven-twelfths of $6,250, or $3,646, is a marital debt to be credited to Daniel.

### 3. EQUITABLE DISTRIBUTION

[11] The third step is to calculate and divide the net marital estate equitably between the parties. There is no mathematical

formula by which property awards can be precisely deter-
mined, but, generally, a spouse should be awarded one-third to
one-half of the marital estate, the polestar being fairness and
reasonableness as determined by the facts of each case. *Scott v.
Scott*, 319 Neb. 877, 25 N.W.3d 439 (2025).

The division of the marital estate, limited to the modifica-
tions discussed above, is as follows:

| Marital Estate: | Daniel | DeeAnn |
| --- | --- | --- |
| Net Assets | $112,847.57 | $170,281.70 |
| Prorated 2023 Tax Debt | (3,646.00) | |
| Debts Per Decree | (65,695.00) | (135,480.31) |
| Net Marital Estate | 43,506.57 | 34,801.39 |
| Modified Equalization Payment | (4,352.59) | 4,352.59 |
| Adjusted Net Marital Estate | 39,153.98 | 39,153.98 |

We have modified Daniel's equalization payment to DeeAnn
as shown above. With these modifications, the property divi-
sion conforms to the general rule that a spouse should be
awarded one-third to one-half of the marital estate. We affirm
the district court's property distribution as modified above.

## 4. ALIMONY

[12,13] Finally, Daniel argues that the district court erred in
its award of alimony.

Section 42-365 states, in part:

When dissolution of a marriage is decreed, the court
may order payment of such alimony by one party to the
other and division of property as may be reasonable, having
regard for the circumstances of the parties, duration of the

marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities of the situation. *Scott v. Scott, supra*. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.*

[14] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Specifically, Daniel argues that DeeAnn did not establish evidence of contributing to the marriage or that she was unable to engage in more gainful employment. Daniel further argues that the district court failed to account for his decreased earning capacity and erred in the duration of alimony.

DeeAnn established evidence that she contributed to the marriage. The district court specifically found that for 2 years DeeAnn took care of the children full time due to their ill son. And when Daniel moved for work in 2019 while the rest of the family stayed in Gering, DeeAnn became the primary caretaker, according to the district court.

However, despite these factual concessions, the district court concluded that the contributions to the marriage weighed in favor of no alimony being awarded. While the district court's reasoning may not be untenable, contributions to the

marriage is only one of the factors in § 42-365 that the district court regards.

We question whether Daniel adequately assigned that DeeAnn failed to establish that she was unable to engage in more gainful employment, but regardless, this argument fails. The district court found that it was unlikely that DeeAnn would be able to earn more in her preretirement years based on her employment history, which included the years she abandoned her prospect to be licensed as an LPN to care for their ill son. The district court's reasoning was not untenable.

Contrary to Daniel's argument, the district court considered his economic circumstances. The district court used the income amount that Daniel stated in his interrogatories from December 2023 in determining alimony. While Daniel's current paystubs from 2024 reflected a lesser income, Daniel had not been working from July 2024 until the time of trial. Even though Daniel was not working due to medical treatment, the district court noted that Daniel expected and desired to return to work soon. It was not untenable for the district court to use the income amount Daniel listed in his interrogatories from 2023. The income listed in the interrogatories was also less than what Daniel had made historically. Further, Daniel had successfully made 16 months of alimony payments at $1,000 even while unable to work. See *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018) (finding ability to pay temporary alimony supports conclusion that party has ability to pay permanent alimony).

Lastly, Daniel argues that the district court erred in the duration of the alimony award. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). Above all else, the duration of an alimony award must be reasonable in light of this purpose. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007). Though the district court did not state its reasoning for the duration of the alimony, the district court found that

DeeAnn's earning capacity was not likely to increase during her remaining preretirement years. As such, DeeAnn was incapable of securing her own means of support before retirement. The district court's alimony award for 90 months' duration can be inferred to reasonably relate to the remaining years both parties have before retirement. We find the district court's duration of alimony is reasonable.

Therefore, the district court did not err in its award of alimony.

## VI. CONCLUSION

We conclude that the district court did not err in ultimately classifying Daniel's FNBO account as marital due to commingling. The district court abused its discretion in classifying Daniel's whole tax debt as nonmarital. The district court's property division is affirmed as modified above.

The district court did not abuse its discretion in its award of alimony.

Affirmed as modified.